## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ONE BARBERRY REAL ESTATE HOLDING, LLC, FARM RIVER ROCK, LLC, JOHN PATTON, *Plaintiffs*, | No. 3:17-cv-00985 (KAD) |
| v. | |
| JOSEPH MATURO, JR., MARK NIMONS, CHRISTOPHER SOTO, MICHAEL MILICI, *Defendants*, | September 27, 2021 |
| TOWN OF EAST HAVEN, *Consol Defendant.* | |

## MEMORANDUM OF DECISION RE:
## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (ECF NOS. 99, 100, 103)

Kari A. Dooley, United States District Judge:

These consolidated actions arise from an attempt by the Town of East Haven ("East Haven" or the "Town") and several of its officials to regulate a quarry owned and operated by Plaintiffs One Barberry Real Estate Holding, LLC ("One Barberry"), Farm River Rock, LLC ("FRR") and John Patton ("Patton," and, collectively, the "Plaintiffs") in East Haven, Connecticut. Plaintiffs bring claims pursuant to 42 U.S.C. § 1983 as well as the Connecticut Constitution, certain statutes, and the common law against the Town and its former Mayor, Joseph Maturo, Jr. ("Maturo"), current tax assessor Michael Milici ("Milici"), Fire Marshal Mark Nimons ("Nimons"), and former Zoning Enforcement Officer Christopher Soto ("Soto," and, collectively, the "Defendants").[1] Pending before the Court are motions for summary judgment filed by the Town (ECF No. 103)

---

[1] Plaintiffs initially filed separate actions against the Town and Maturo, Soto, Nimons, and Milici but the lawsuits were consolidated on July 19, 2018. (*See* ECF No. 35.)

and by Maturo, Milici, Nimons, and Soto (ECF Nos. 99, 100) (collectively, the "Individual Defendants") with respect to each of Plaintiffs' claims.[2]  For the reasons that follow, the Town's motion is DENIED with respect to Plaintiffs' substantive due process and takings claims brought pursuant to 42 U.S.C. § 1983, DENIED as to Plaintiffs' claims under Article First, Section 11 of the Connecticut Constitution and for municipal estoppel, and GRANTED in all other respects. The Individual Defendants' motion is DENIED with respect to Plaintiffs' substantive due process and takings claims brought pursuant to Section 1983 against Maturo and Soto, DENIED as to Plaintiffs' slander of title claim against Milici, and GRANTED in all other respects.

**Relevant Facts**

The following facts are drawn from the Defendants' Local Rule 56(a)(1) Statement of Undisputed Material Facts ("LRS") ("Defs.' LRS," ECF No. 105[3]), the Plaintiffs' response thereto and Statement of Additional Material Facts ("Pls.' Resp. to LRS," ECF No. 118[4]), and from the exhibits in the record.  The citations to Defendants' LRS are to those portions that are undisputed by the Plaintiffs unless otherwise noted.

---

[2] The Individual Defendants have filed duplicative motions for summary judgment which the Court assumes to be in error.  The Court accordingly DENIES as moot the motion for summary judgment at ECF No. 100.

[3] The Court refers to East Haven's LRS, which, with the exception of paragraphs 70–71, which contain additional factual matter, is identical to the Individual Defendants' LRS (ECF No. 102.)  The East Haven Defendants' exhibits and the Individual Defendants' exhibits are likewise the same.  (*Compare* ECF No. 102-1 *with* ECF No. 105-1.)

[4] D. Conn. Local Rule 56(a)3 requires that each statement by a moving or opposing party set forth in the LRS "be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial."  Many of Plaintiffs' responses to Defendants' LRS and Statement of Additional Material Facts are not compliant with this Rule insofar as Plaintiffs have lumped together multiple extensive factual statements, which are followed not by individual citations for each statement but, rather, to string citations that do not distinguish the corresponding citations and factual assertions.  Although not the Court's obligation, the Court has tried to reduce the confusion created by Plaintiffs' chosen course by, to the extent it is able, reconciling the string citations to the evidence with the factual assertions preceding the citations.  Notwithstanding, the Court has deemed those facts which are supported by the evidence and not accompanied by a specific denial admitted pursuant to L.R. 56(a)3.  *See Shetucket Plumbing Supply Inc. v. S.C.S. Agency, Inc.*, 570 F. Supp. 2d 282, 283 n.1 (D. Conn. 2008) (concluding that certain facts should be "deemed admitted because they have not been squarely denied with specific citation to evidence in the record as Local Rule 56(a)(3) requires"); *S.E.C. v. Glob. Telecom Servs., L.L.C.*, 325 F. Supp. 2d 94, 108 (D. Conn. 2004) ("FED. R. CIV. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.").

One Barberry is the owner of property located at 1 Barberry Road in East Haven, Connecticut (the "Property") at which FRR leases and operates a quarry that also engages in stone crushing, stone product manufacturing, and earth product excavation.  (Patton Aff. ¶ 4, Pls.' Ex. V, ECF No. 119-22.)  One Barberry acquired the Property from What TF, LLC ("What TF") on March 11, 2016 via warranty deed.  (Defs.' LRS ¶ 3.)  Before that time, FRR leased the Property from What TF.  (*Id.* ¶ 4.)  What TF was owned by Mark DiLungo ("DiLungo"), who acquired the Property in the mid-2000s via foreclosure from Joseph Spezzano.  (*Id.* ¶¶ 5–6.)  Patton currently manages the quarry and is an owner of One Barberry and FRR; he also serves as a guarantor for each entity's indebtedness.  (Patton Aff. ¶¶ 4–5.)  This case encompasses disputes regarding both zoning enforcement and tax assessment with respect to the operation of the quarry.

**Zoning Enforcement**

On April 5, 2013, Attorney Nicholas Mingione ("Mingione") contacted the Town and expressed his position that the Property was exempt from zoning and permitting requirements based on its pre-existing, non-conforming use as a quarry.[5]  (Defs.' LRS ¶¶ 9–10.)  He cited a historical search which he stated revealed clear evidence of such use in the zoning files.  (*Id.* ¶ 11.)  Attorney Joseph Zullo ("Joe Zullo") responded to Mingione on behalf of the Town and disputed that there was a sufficient basis for finding that the Property was subject to a pre-existing, non-conforming use for quarrying; he further stated that it was the Town's belief that the quarry "was not maintained with sufficient regularity and that it has been discontinued or abandoned."  (*Id.* ¶ 12.)  On April 25, 2013, Joe Zullo composed a memorandum in which he outlined the events and legal analysis which led him to these conclusions.  (Defs.' Ex. 7, ECF No. 105-8.)  Frank Biancur, the Town's Planning and Zoning Administrator ("Biancur"), then purportedly sent a letter to

---

[5] The parties appear to dispute on whose behalf Mingione reached out to the Town, but the issue is not material to resolving the instant motions.

3

Mingione on May 1, 2013 in which he stated that after performing "quite a bit of research" on the Property and applicable laws, the Town had "come to the determination that your claim of a pre-existing, nonconforming use for quarry does not exempt you from the procedural requirements of needing to obtain a special exception permit through the Planning and Zoning Commission for the same." (Defs' Ex. 9, ECF No. 105-10.)  Plaintiffs dispute the authenticity of this letter as it is not signed and they claim there is no evidence that it was ever sent.  (Pls.' Resp. to LRS ¶ 15.)

However on November 10, 2014, Biancur issued a decision addressed to What TF in which he stated that "there is no doubt that this property is a **legal pre-existing nonconforming use**" based upon evidence that the Property had "operated as a quarry, gravel, and stone crushing site for well over 75 years, if not longer." (Defs.' Ex. 11, ECF No. 105-12 (emphasis in original).)  He therefore concluded that "there are no Zoning issues" at the Property and "the operation at 1 Barberry Road should continue without any interference from the Town." (*Id.*)  The decision was stamped as received for the Town's land records on November 12, 2014.  (*Id.*)

The parties dispute the significance of Biancur's November 2014 decision.  Defendants contend that it was "directly at odds with the town's position as expressed by [Joe] Zullo and Biancur's own opinion as stated in his letter from May 2013." (Defs.' LRS ¶ 18.)  They assert that there was no triggering event that would have prompted Biancur to issue the decision, which in turn would have alerted the Town to seek an appeal.  (*Id.* ¶ 19.)  Defendants further speculate that by publishing the decision in the *New Haven Register* as opposed to the local paper where such notices are typically published, Biancur may have sought to avoid alerting Town officials to the decision.[6]  (*Id.* ¶ 20; Defs.' Ex. 11.)  Defendants also cynically note that Biancur was convicted in 2015 on federal charges for soliciting and accepting bribes in connection with the performance of

---

[6] This supposition ignores the undisputed fact that Biancur's decision was copied to Sal Brancati ("Brancati"), the Town's Director of Administration and Management, and Milici, the Town Assessor.  (Defs.' Ex. 11.)

his official duties, providing additional reason to question "whether Biancur's letter was issued in good faith." (Defs.' LRS ¶ 20 n.2.)

Plaintiffs, on the other hand, first dispute that Biancur's decision was an "about-face" as characterized by Defendants. (Pls.' Resp. to LRS ¶ 17.) They observe that in April 2013, George Mingione, East Haven's former Planning Administrator and Zoning Enforcement Officer ("ZEO"), had provided an affidavit to the Town in which he stated that the Property was "recognized as a pre-existing non-conforming use property for rock excavation and quarry" and that during his tenure "information was provided and recognized that the aforementioned rock excavation and quarrying uses [were] established long before the establishment of zoning in the Town of East Haven." (G. Mingione Aff. ¶ 7, Ex. E to Pls.' Ex. FFF, ECF No. 119-58.) He further stated that during his tenure the Property was "not subject to any zoning enforcement actions of any kind associated with the excavation and quarrying uses" and that the Property was "not required to obtain any zoning permits, special permits, Planning and Zoning Commission approvals and/or Zoning Board of Appeals approvals for the rock excavation and quarry uses." (*Id.* ¶¶ 9–10.) In October 2014 Milici had also written a memorandum to Brancati in which he acknowledged that the quarry operation at the Property dated back to at least the early 1960s and predated the current zoning regulations. (Defs.' Ex. 32, ECF No. 105-33.) Milici stated that "when this issue first surfaced to this office in 2006, the then ZEO George Mingione advised that this was in fact a pre-existing non-conforming use for the property." (*Id.*)

Plaintiffs also argue that intervening events, occurring between the April/May 2013 correspondence and the November 2014 decision, explain Biancur's ultimate conclusion even if it was contrary to a prior conclusion. (Pls.' Resp. to LRS ¶ 18.) Specifically, in 2014 What TF retained Attorney Mark Branse ("Branse") to work with the Town to obtain recognition of the

Property's legally existing, non-conforming use as a quarry (Patton Aff. ¶ 14; Hughes Aff. ¶ 4, Pls.' Ex. L, ECF No. 119-12), and Plaintiffs claim that this process led to the discovery and production of additional evidence to support What TF's position.  (Pls.' Resp. to LRS ¶ 18.)

Plaintiffs next dispute that the Town was not on notice of Biancur's decision given that Biancur's letter, as noted above, was sent to Brancati and Milici, recorded in the land records, and noticed publicly in the *New Haven Register*.  (*Id.* ¶ 19.)  They assert that there is no evidence to support Defendants' speculation that Biancur sought to avoid alerting East Haven officials to the decision by publishing notice in the *New Haven Register*.  On this issue, Plaintiffs observe, the notice in the *New Haven Register* was published not by Biancur, but by Branse's law firm.  (*Id.* ¶ 20; Defs.' Ex. 11.)  Finally, Plaintiffs challenge Defendants' further speculation that Biancur's subsequent conviction called into question his good faith in issuing the decision, citing the absence of evidence to support this claim.  (Pls.' Resp. to LRS ¶ 20 n.2.)

According to Patton, the November Biancur 2014 decision prompted Plaintiffs to make significant capital investments in the quarry, and, in reliance on that decision, they "expended millions of dollars and incurred substantial indebtedness to invest in quarry manufacturing equipment" as well as acquired ownership of the Property.  (Patton Aff. ¶¶ 19–20.)  Plaintiffs contend that "[f]rom October 2013 through May 9, 2017 FRR continuously operated the Quarry with the full knowledge of the officials of the Town of East Haven."  (*Id.* ¶ 21.)  In February 2016, Attorney Branse's law firm sent Joe Zullo a letter "to verify that the property located at 1 Barberry Road, East Haven Connecticut, . . . has the status of a legal non-conforming use as a quarry, gravel, and stone-crushing site."  (Pls.' Ex. R at 1, ECF No. 119-18.)

In February 2017, then-ZEO Soto received a complaint regarding the "slashing of trees" at the Property.  (Soto Dep. Tr. at 25–26, Defs.' Ex. 10, ECF No. 105-11.)  Soto inspected the

Property and took pictures of the trees that had been slashed.  (*Id.* at 26:11–13; *see also* Defs.' Ex. 14, ECF No. 105-15.)  Plaintiffs take issue with this characterization and assert that they did not "slash" trees as that term is used in the forestry context but, rather, cut them down.  (Pls.' Resp. to LRS ¶ 25; Patton Aff. ¶ 37.)  On February 17, 2017 Soto issued a cease and desist order informing Plaintiffs that tree slashing was prohibited under Section 31 of the Town's zoning regulations and that Plaintiffs would need to apply for a special exception permit to engage in such activity.  (Defs.' LRS ¶ 26.)  According to Plaintiffs, however, Joe Zullo stated during a March 2017 meeting to discuss the quarry that he agreed with Attorney Branse's February 2016 assessment that the quarry was a legally existing, non-confirming use and that the Town could not lawfully regulate the quarry under Section 31 but that he was waiting for the right time to communicate this conclusion to then-Mayor Maturo.  (Pls.' Add'l. Statement of Facts ¶ 33.)  Specifically, FRR investor Peter Hughes ("Hughes") averred that during the March 2017 meeting, Joe "Zullo stated that he would tell the Mayor that he, Attorney Zullo, agreed with Attorney Branse's law firm's letter that the Quarry operation was a legally existing, nonconforming use, but that he would have to find the right time to tell the Mayor."  (Hughes Aff. ¶ 7, Pls.' Ex. L.)  FRR Investor Alan Temkin similarly testified that "Joe Zullo at that meeting looked us in the eye and said . . . I believe that you are right that you have a pre-existing non-conforming use.  And he looked at us and said, however, I can't get that squared away until I can get the mayor when he's in a good frame of mind, and when I do that, I will tell him this, that you have a pre-existing non-conforming use."  (Temkin Dep. Tr. at 14:19–25, 15:1–3, Pls.' Ex. B, ECF No. 119-2; *see also, e.g.*, Patton Aff. ¶ 40; Patton Dep. Tr. at 57:1–10, Pls.' Ex. A, ECF No. 119-1; DiLungo Dep. Tr. at 8:15–18[7], Pls.' Ex. I, ECF No. 119-9; Alter Aff. ¶¶ 13, 17, Pls.' Ex. M, ECF No. 119-13.)

---

[7] DiLungo testified that "Patton even said at that meeting, I know you guys are right but, you know, you've guys[sic] got to give me time to convince the mayor."  The Court interprets the reference to Patton instead of Joe Zullo as a typo

After the cease and desist order was issued, Soto testified that the quarry continued to remove trees and stumps from the area.  (Soto Dep. Tr. at 30:1–21, Defs.' Ex. 10.)  Soto then issued an amended cease and desist order on April 21, 2017, which he testified he composed on the advice of the State's Attorney's Office,[8] to clarify that the removal of stumps and earthwork was included in Article 31 of the zoning regulations and was thereby prohibited by the prior order.  (*Id.* at 34:3–16; *see also* Defs.' Ex. 17, ECF No. 105-18.)  Soto also testified that he had received complaints from neighbors regarding rocks rolling down the hill and that he observed rocks rolling down the hill upon his inspection of the Property, as well as a rock about the size of a car engine that was "sitting almost in the road."  (Soto Dep. Tr. at 45:24–25, 46:1–2, 47:6–13, 48:3–21, Defs.' Ex. 10.)  In this vein, the amended cease and desist order stated that "large rocks have been observed rolling down the face of a large hill towards the road and on occasion even onto the road itself [due] to the continued operations on site," and directed Plaintiffs to "cease operations immediately and ensure that no further rock sliding occurs." (Defs.' Ex. 17 at 1.)  It further directed Plaintiffs to install appropriate sedimentation and erosion controls and to file for a Special Exception pursuant to Section 31 of the zoning regulations.  (*Id.* at 2.)  Although they did not agree with the reasoning of the cease and desist orders, Plaintiffs represent that "in the spirit of cooperation," they "undertook substantial compliance measures voluntarily and at great expense, . . . and voluntarily complied with the cease and desist orders to the extent legally possible." (Patton Aff. ¶ 44.)  This included building a 10' high, 15' deep and 2,000' long berm to prevent any stray rocks from rolling off of the Property.  (*Id*. ¶ 46.)  To the extent Defendants claim that

---

in light of DiLungo's statement in the prior sentence that "we walked out of there thinking everything was fine, according to Mr. Zullo, Joe Zullo."  (*Id.* at 8:13–15.)

[8] Plaintiffs object to the portion of Soto's testimony addressed to the advice he received from the State's Attorney's Office as hearsay.  (Pls.' Resp. to LRS ¶¶ 30–31.)

the rock sliding off the Property was due to blasting, Plaintiffs dispute this contention—asserting that no blasting took place at the Property in April 2017.  (*Id.*; Pls.' Resp. to LRS ¶ 33.)

On May 9, 2017, Soto sent an immediate cease and desist/stop work order to FRR, stating that "after an inspection on May 8, 2017, it has been found that your property is in violation of the Town's Zoning Regulations."  (Defs.' Ex. 24 at 1, ECF No. 105-25.)  The letter stated that Plaintiffs must cease all operations immediately upon receipt and directed Plaintiffs to file for a Special Exception in order to remedy the issue.  (*Id.* at 1–2.)  Defendants claim that this letter was "the cumulative result of these various issues and the town's concerns over both safety and the lack of information provided by the Plaintiffs" (Defs.' LRS ¶ 48), while Plaintiffs assert that the justifications for the cease and desist letter were fabricated.  (Pls.' Resp. to LRS ¶ 48; Patton Aff. ¶ 68.)  According to Plaintiffs, they promptly acted to address any problem that the Town identified with the quarry and did not apply for a special permit under Section 31 of the zoning regulations because Section 31 excludes quarries "by its very requirements."  (Patton Aff. ¶ 68.)  Plaintiffs also assert that there was no precipitating event between the April 21 and May 9 cease and desist orders that could have justified the latter; for example, Joe Zullo testified that he was not aware of what prompted Soto to issue the May 9 order.  (Joe Zullo Dep. Tr. at 114:25, 115:1–4, Pls.' Ex. G, ECF No. 119-7.)  According to Plaintiffs, "no rocks or boulders came off the Property after April 20, 2017."  (Patton Aff. ¶ 46.)  And Soto himself testified that he could not remember anything occurring between April 21 and May 2, 2017 that caused him to pursue next steps.  (Soto Dep. Tr. at 78:21–24, Pls.' Ex. K, ECF No. 119-11.)  Soto also testified that in instructing Plaintiffs to apply for a permit under Section 31, he did not actually analyze whether the quarry could operate under Section 31's requirements.  (*Id.* at 130:10–16, 132:4–6, 22–23.)

Case 3:17-cv-00985-KAD    Document 139    Filed 09/27/21    Page 10 of 55

Around this time Joseph Carfora ("Carfora"), who would later become Mayor, was organizing a neighborhood group to oppose the quarry based on his belief that it was interfering with the residents' quality of life. (Defs.' LRS ¶¶ 45–46; Carfora Dep. Tr. at 23–26, Defs.' Ex. 23, ECF No. 105-24.) Plaintiffs maintain that then-Mayor Maturo shut down the quarry for his own political gain, including due to the political pressure initiated by Carfora. (*See* Pls.' Resp. to LRS ¶ 48.) For example, DiLungo testified that a week before the Town shut down the quarry, Maturo told DiLungo that "Joe Carfora at the time was running a group of people that was going to make it bad for him and he wasn't going to lose another election like he did from the quarry on Russo Avenue."[9] (DiLungo Dep. Tr. at 36:23–25, 37:1–5, Pls.' Ex. I.) At a meeting of the Town Code Enforcement Committee on May 9, 2017, Maturo is attributed with the statement that "a lot of calls are coming into the various offices saying that blasting is going on but there is no blasting going on because no permits have been given and will not be given . . . Joe Carfora is building a house up there so he is spearheading a group who is meeting tonight at the Foxon Fire House like the group on Russo Ave in the past that was against the quarry up there." (Pls.' Ex. W at 1, ECF No. 119-23.) According to Patton, on that same day Joe Zullo informed him by phone that Maturo "had told Town officials to 'do whatever it takes to shut them down.'" (Patton Aff ¶ 55.) And as discussed above, the final cease and desist order was, in fact, issued that same day—May 9, 2017.

The Plaintiffs also claim to have encountered interference from Nimons, the Fire Marshal, in connection with the issuance of blasting permits.[10] Although Nimons testified that blasting

---

[9] The reference to Russo Avenue was regarding a group that had been formed to stop another rock quarry in town. (*See* Carfora Dep. Tr. at 32:19–24, Pls.' Ex. III, ECF No. 119-61.)

[10] At some point in time, while the Town was sorting out its concerns with the quarry, Nimons began issuing one-day blasting permits to FRR instead of the 30-day permits that had historically been issued pursuant to a deal previously struck between Brancati and DiLungo. (Nimons Dep. Tr. at 22:17–25, 23:1–15, Defs.' Ex. 20, ECF No. 105-21.) Defendants appear to suggest that this took place in 2017, although Nimons testified that he believed this change occurred in late 2015 or early 2016. (*Id.* at 23:24.) In any event, Plaintiffs dispute that DiLungo was authorized to act on their behalf after the sale of the Property. (Pls.' Resp. to LRS ¶ 44.) They also assert that they never agreed to

permits are regulated by the State and not the Town (*see* Nimons Dep. Tr. at 14:19–22, 18:25, 19:1–2, Pls.' Ex. E, ECF No. 119-5), according to Plaintiffs Maturo had prohibited the Fire Marshal from issuing permits without Maturo's approval.  For example, Hughes reviewed the Fire Marshal's file on the quarry in December 2015 or January 2016 and observed "a note in the file that said not to issue blasting permits for the Quarry without first calling the Mayor's office." (Hughes Aff. ¶ 5.)  And Brancati testified that Nimons would call Brancati to seek permission to issue blasting permits whenever someone from the quarry requested them, though "why he called me I have no idea."  (Brancati Dep. Tr. at 25:9–25, Pls.' Ex. J, ECF No. 119-10.)  Brancati would then seek Maturo's approval to issue the permit, which, he testified, Maturo "always granted."  (*Id.* at 26:1–12.)  When asked, over counsel's objection, whether Maturo's instruction that the quarry not be issued blasting permits at a certain point until December of 2015 could have been motivated by an election in November 2015, Brancati testified that "If I were to make a guess, that's probably a very good assumption."  (*Id.* at 27:13–14; *see also* Pls.' Add'l LRS ¶ 60.)  However Maturo testified that he could not recall ever suggesting to Nimons that he limit the issuance of blasting permits to Plaintiffs.  (Maturo Dep. Tr. at 57:21–24, 59:14–20, Pls.' Ex. F, ECF No. 119-6.)

Following the May 2017 cease and desist order, Nimons stopped issuing blasting permits to Plaintiffs' contractors.  (Defs.' LRS ¶ 51.)  Given that "blasting the solid rock is an integral part of the Quarry operation, the Quarry could not operate without blasting permits."  (Patton Aff. ¶ 58.)  Plaintiffs immediately filed the instant lawsuits and simultaneously appealed the cease and desist orders.  (Defs.' LRS ¶ 52.)  Attorney Alfred Zullo ("Al Zullo"), who served as an assistant town attorney for East Haven from 2011 to 2019 and attorney for the Zoning Board of Appeals ("ZBA"), prepared a legal staff report for the ZBA in response to Plaintiffs' appeal. (*Id.* ¶¶ 53–55;

---

this arbitrary one-day permit limitation, which ignored local weather conditions and exposed them to additional disturbance and risk.  (Patton Aff. ¶ 62.)

Defs.' Ex. 27, ECF No. 105-28.)  Plaintiffs claim that Al Zullo was conflicted by virtue of the fact that his law firm was advocating for Defendants in connection with the instant lawsuits at the time he advised the ZBA and because he and another attorney in his firm had participated in the drafting of the May 2017 cease and desist order that was the subject of the appeal.  (Pls.' Resp. to LRS ¶ 55; *see, e.g.*, Nimons Dep. Tr. at 53:14–15, Pls.' Ex. E; Soto Dep. Tr. at 104:8–11, 105:22–25, 108:7–9, Pls.' Ex. K.)

After the ZBA denied the appeal, Plaintiffs pursued a subsequent appeal to the Connecticut Superior Court.  (Defs.' LRS ¶ 58.)  On August 28, 2019, the Superior Court issued a decision in Plaintiffs' favor.[11]  (*See* Defs.' Ex. 28, ECF No. 105-29.)  In its written opinion the court concluded that the Town did not satisfy the "very high standard" required to invoke the exception that would permit a collateral attack on Biancur's November 2014 decision, which the Town neglected to appeal at the time despite having the ability to do so.  (*See id.* at 12.)  The court rejected East Haven's argument that Biancur's federal conviction rendered his letter not binding, noting that "[t]he record is devoid of any evidence that Biancur's criminal activity was in any way related to the issues in the current action."  (*Id.* at 11.)  To the extent the Town sought to apply Section 31 of the zoning regulations to the quarry, the court agreed with Plaintiffs that Section 31 was inapplicable to the quarry's legal, nonconforming use.  (*Id.* at 13–16.)  The court therefore held that Soto's cease and desist letters were improper.  (*Id.* at 16.)  The Connecticut Appellate Court denied the Town's petition for certification to appeal.  (Pls.' Ex. TT, ECF No. 119-46.)

---

[11] Although Plaintiffs filed two separate appeals—one related to the first two cease and desist orders and a second concerning the third, the court and the parties treated its decision as determinative of the issues in both appeals.  (*See* Defs.' LRS ¶ 58 n.3; Defs.' Ex. 28. at 1 n.2.)

**Tax Issues**

### *Personal Property Manufacturing Exemptions*

For the Grand List years 2014, 2015, and 2016, Plaintiffs applied for personal property manufacturing exemptions for their quarry equipment.  (Defs.' LRS ¶ 65.)  Milici, who has served as the Town's tax assessor for over 30 years (*see id.* ¶ 63), testified that when the original manufacturing exemption was filed in 2014, his opinion was that the exemption did not apply based on the fact that he did not provide the same exemption to the other quarry in town.[12]  (Milici Dep. Tr. at 33:22–24, 34:2–10, Defs.' Ex. 30, ECF No. 105-31.)  Plaintiffs appealed the Town's 2015 denial of the exemption, which resulted in an appeal to the Connecticut Superior Court that was ultimately settled by stipulated judgment.  (Defs.' LRS ¶¶ 68–69.)  Pursuant to the stipulated judgment, the manufacturing equipment at issue was deemed exempt from taxation in Plaintiffs' 2015 Declaration of Personal Property and would continue to qualify for the exemption for subsequent tax years so long as it is used as exempt property and the applicable statute is not amended.  (Defs.' Ex. 31 ¶¶ 1–3, ECF No. 105-32.)  The parties also stipulated that the Town would pay Plaintiffs a refund totaling $20,781.20 for taxes previously paid for the Grand List dated October 1, 2015.  (*Id.* ¶ 4.)  Following the settlement, Joe Zullo stated at a Town Council Meeting that because, during the course of the appeal, Plaintiffs were required to disclose information regarding their production activities, "we are now able to tax the land at a significantly higher rate" and are "actually getting more revenue than before."  (Defs.' Ex. 39 at 17, ECF No. 105-40.)

### *Farmland Classification*

The Property extends into North Branford (*see* Defs.' LRS ¶ 23) and Milici testified that he met with DiLungo in 2014 after he acquired the Property, who confirmed that quarrying was

---

[12] Plaintiffs dispute that there was another quarry in town, stating that Milici's reference was to a site that blasted and crushed stone as part of a permitted land development and did not operate as an actual quarry.  (*See* Patton Aff. ¶ 32.)

also taking place on the East Haven side.  (Defs.' LRS ¶ 72; Milici Dep. Tr. at 40:18–20, Pls.' Ex. C, ECF No. 119-3.)  As noted previously on October 27, 2014, Milici wrote a memorandum addressed to Brancati in which he stated that historically the Town had classified the Property as farmland but "[b]ased on information brought to the attention of the Assessor's office in recent years there appears to have been an ongoing sand/gravel/quarrying operation dating back to at least the early 1960's and quite possibly the mid-1950's," which would have predated the Town's current zoning regulations.  (Defs.' Ex. 32.)  Milici thus stated that the Town was declassifying nine acres of farmland which would be taxed "as industrial land at a substantially higher rate." (*Id.*)

In May 2016, after the sale of the Property to FRR, DiLungo approached Milici regarding an application for a farmland tax exemption for the Property.  (Defs.' LRS ¶ 74.)  DiLungo signed the farmland application as an owner of the Property (Defs.' Ex. 33, ECF No. 105-34) but later admitted that he was not authorized to do so or to act on behalf of Patton or FRR.  (DiLungo Dep. Tr. at 48:3–24, 51:13–19, Pls.' Ex. I.)  According to Plaintiffs, the application, even if authorized (which it was not) was also not submitted within 30 days of promulgation of the Grand List as required by statute.  (*See* Pls.' Ex. SS, ECF No. 119-45.)  Milici granted the farmland exemption but was subsequently contacted by counsel for Plaintiffs, who informed him that DiLungo had not been authorized to file the application and demanded that Milici "file a corrected Certificate on or before Friday, June 23, 2017, removing the *Farm Land* designation from my client's property." (Pls.' Ex. QQ, ECF No. 119-43; Defs.' LRS ¶ 75.)  Notwithstanding, Milici testified that he did not immediately remove the farmland exemption because he was waiting for authorization from Plaintiffs, which he never received.  (Milici Dep. Tr. at 108:6–8, Pls.' Ex. C.)  Plaintiffs maintain that the farmland designation would have caused Plaintiffs to incur significant penalties upon a

change of use or sale of the Property, all to the benefit of the Town.  (*See* Patton Aff. ¶ 69.)  On December 6, 2017, counsel for Milici wrote to Plaintiffs' counsel indicating that "since no current farming operations are actively being conducted at the premises, Mr. Milici has removed the farmland exemption as a regular matter of course as of October 1, 2017."  (Pls.' Ex. RR, ECF No. 119-44.)

### *Revaluation*

In 2016, the Town hired a revaluation company to assist it with performing a statistical revaluation of the Grand List using mass valuation techniques.  (Defs.' LRS ¶¶ 78–79.)  In October 2016, before the revaluation work was complete, the company purportedly sent revaluation notices for some properties by mistake, to include the quarry.  (*See id.* ¶ 81.)  The quarry notice indicated that the Property was assessed at $572,280.  (Defs.' Ex. 36, ECF No. 105-37.)  However the property owners who had received such premature notices were not told about the mistake and Plaintiffs claim that they were never informed of the error.  (Milici Dep. Tr. at 75:10–19, Pls.' Ex. C; *see* Pls.' Resp. to LRS ¶ 81.)  Shelby Jackson ("Jackson"), who assisted Milici with the revaluation, believed he informed Milici that the revaluations were not complete when he learned that the notices had been sent out prematurely, though he did not seem to recall the specific events concerning the revaluation notices for the Property.  (Jackson Dep. Tr. at 38:13–24, 40:2–25, 41:1–3, Defs.' Ex. 35, ECF No. 105-36.)  He was also not aware of any documentation indicating that the October 2016 notice was, in fact, sent in error.  (Jackson Dep. Tr. at 39:15–25, 40:1, Pls.' Ex. D, ECF No. 119-4.)  The Property was subsequently revalued at $2,283,780.  (*See* Defs.' Ex. 38, ECF No. 105-39.)  Plaintiffs dispute that the initial revaluation notice was sent by mistake and assert that Milici fabricated this claim to cover up the fact that the higher revaluation was imposed

punitively and to retaliate for Plaintiffs' successful settlement of the tax appeal. (Pls.' Resp. to LRS ¶ 81.)

Milici testified that he ultimately calculated the assessed value of the Property using the $4.4 million sales price as a basis. (Milici Dep. Tr. at 83:18–21, Defs.' Ex. 30.) Jackson and Milici claimed that before resorting to this method they first sought information from Patton that they would have used to calculate the Property's value consistent with a formula Milici had developed for another quarry operation but that Patton never provided the requested information. (Defs.' LRS ¶¶ 84–86.) However, in making his request to Patton via email, Milici did not indicate that the information was sought for revaluation purposes (see Defs.' Ex. 37, ECF No. 105-38), and Plaintiffs argue that Defendants' claims are otherwise belied by Jackson's statement that he finished his work by the end of November 2016. (Jackson Dep. Tr. at 109:5–8, Pls.' Ex. D; see Pls.' Resp. to LRS ¶ 81.) Milici's email, by which he purportedly sought the information necessary for an alternative revaluation, was not sent until November 28, 2016. (Defs.' Ex. 37.) Plaintiffs also claim that they did not timely receive either the allegedly premature October 2016 tax revaluation notice or the final December 2016 notice because the Town Assessor's Office inexplicably changed Plaintiffs' mailing address to 218 Foxon Road in East Haven, which is not Plaintiffs' address. (Patton Aff. ¶ 31.) The 2016 revaluation is the subject of a pending tax appeal.[13] See One Barberry Real Estate Holding, LLC v. Town of East Haven, No. HHB-CV-17-6038523-S (Conn. Super. Ct. filed May 12, 2017).

Based on the foregoing, Plaintiffs assert claims against the Town in their Second Amended Complaint (ECF No. 94) pursuant to 42 U.S.C. § 1983 for violations of the Constitution's

---

[13] According to Patton, after the Town shut down the quarry in May 2017, it revalued the Property from "industrial" to "vacant residential" and appraised it at $878,300, which Plaintiffs contend is a vastly higher cost per-acre than the 31.52 and 16.09 acre properties that are contiguous to the Property and across the street, respectively, and is "the highest priced vacant property by far in the Town of East Haven." (Patton Aff. ¶ 74.)

Commerce Clause and Bill of Attainder Clause, and of Plaintiffs' rights guaranteed by the First, Fifth, and Fourteenth Amendments (Count One),[14] a claim for taking by inverse condemnation under Article First, § 11 of the Connecticut Constitution (Count Two), and a claim sounding in municipal estoppel (Count Three).  Plaintiffs assert the same constitutional claims against the Individual Defendants in the operative Second Amended Complaint (ECF No. 93) pursuant to Section 1983 (Count One), as well as claims against the Individual Defendants for: conspiracy to interfere with civil rights pursuant to Section 1985 (Count Two); civil conspiracy (Count Three); intentional, willful and malicious conduct (Count Four); prima facie tort liability for intended consequences (Count Five); prima facie tort liability for intentional harm to property interests (Count Six); statutory theft in violation of Conn. Gen. Stat. § 52-564 (Count Seven); conversion (Count Eight); intentional interference with contractual relationships (Count Nine); intentional interference with prospective business relationships (Count Ten); violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, *et seq.* (Count Eleven); injunctive relief (Count Twelve); and a claim sounding in slander of title against Milici (Count Thirteen).  Plaintiffs have clarified in their opposition memorandum that they are not pursuing Counts Two, Eleven, and Twelve, and summary judgment is accordingly granted to the Individual Defendants as to these claims.  (*See* Pls.' Mem. at 40 n.21, ECF No. 117.)

**Standard of Review**

The standard under which the Court reviews motions for summary judgment is well-established.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

---

[14] Defendants do not address Plaintiffs' claims under the Commerce Clause and Bill of Attainder Clause in their motions for summary judgment.  Because the Second Amended Complaint does not assert these claims as separate bases for liability and because Plaintiffs do not rely upon these theories in their opposition memoranda, it is the Court's understanding that Plaintiffs are no longer pursuing these claims.

Civ. P. 56(a).  "A genuine issue of material fact is one that 'might affect the outcome of the suit under the governing law' and as to which 'a reasonable jury could return a verdict for the nonmoving party.'"  *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The inquiry conducted by the Court when reviewing a motion for summary judgment focuses on "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson*, 477 U.S. at 250.  Accordingly, the moving party satisfies its burden under Rule 56 "by showing . . . that there is an absence of evidence to support the nonmoving party's case."  *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (*per curiam*) (quotation marks and citations omitted).  Once the movant meets its burden, "[t]he nonmoving party must set forth specific facts showing that there is a genuine issue for trial."  *Irizarry v. Catsimatidis*, 722 F.3d 99, 103 n.2 (2d Cir. 2013) (quoting *Rubens v. Mason*, 527 F.3d 252, 254 (2d Cir. 2008)).  "[T]he party opposing summary judgment may not merely rest on the allegations or denials of his pleading" to establish a disputed fact.  *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice.  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  The standard thus requires "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson*, 477 U.S. at 249. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.* at 249–50 (internal citations omitted).

In assessing the presence or absence of a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012)

(*per curiam*) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).  "In deciding a motion for summary judgment, the district court's function is not to weigh the evidence or resolve issues of fact; it is confined to deciding whether a rational juror could find in favor of the non-moving party."  *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002).

**Discussion**

**East Haven's Motion for Summary Judgment**

*Section 1983 Claims*

Title 42, U.S.C. Section 1983 provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  "Local governments and municipalities are 'persons' within the meaning of the statute, and therefore liability may attach to municipalities under section 1983."  *Doe v. City of Waterbury*, 453 F. Supp. 2d 537, 542–43 (D. Conn. 2006), *aff'd sub nom. Roe v. City of Waterbury*, 542 F.3d 31 (2d Cir. 2008).  The circumstances under which such liability may attach are discussed below.

*Monell* Liability

"In *Monell v. Department of Social Services*, . . . the Supreme Court established that 'local governing bodies can be sued directly under 42 U.S.C. § 1983 for monetary, declaratory, or injunctive relief where, . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'"  *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 124–25 (2d Cir. 2004)

(quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978)) (alterations omitted).  "The elements of a *Monell* claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right."  *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020).  East Haven asserts as a threshold matter that Plaintiffs cannot hold the Town liable under Section 1983 because they cannot establish that an official policy or custom of East Haven, as opposed to the actions of any individual Town employee, caused their alleged injuries.

"The Supreme Court has said that a municipality may be liable for the acts of a single official—but only if that official is someone 'whose edicts or acts may fairly be said to represent official policy' for the entire municipality."  *Id.* at 98 (quoting *Monell*, 436 U.S. at 694).  "It is not enough that an official had discretion to make a decision that was unreviewable."  *Id.*  Instead, the official must have had authority to make final policy in his area of the municipality's business. *See id.*  "[T]he critical inquiry is not whether an official generally has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit."  *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008).  "Whether the official in question possessed final policymaking authority is a legal question, which is to be answered on the basis of state law."  *Agosto*, 982 F.3d at 98 (quoting *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000)).

Plaintiffs assert, without analysis, that each of the named Town official Defendants was a policymaker for purposes of the Town's *Monell* liability.  First, they assert that Maturo acted as a final policymaker in giving the directive to shut down the quarry based on his broad mandate to oversee the administration of all departments and agencies as Mayor.  Second, Plaintiffs submit that Nimons was a final policymaker with respect to the issuance of blasting permits.  Third, they

argue that Soto had policymaking authority to issue the cease and desist orders. And fourth, Plaintiffs contend that Milici acted as a final policymaker in appraising Plaintiffs' property and designating a portion of it as farmland without Plaintiffs' consent. (Pls.' Mem. at 30–31, ECF No. 116.) Plaintiffs do not cite any relevant legal authority to support these broad and conclusory assertions.

Defendants respond that because the only damages that Plaintiffs claim with respect to the zoning enforcement activities emanate from the ZBA's decision to uphold the cease and desist orders, Maturo, Nimons, and Soto did not possess final policymaking authority with respect to the determination that Section 31 of the zoning regulations applied to the quarry. The Court agrees that the ZBA, not the Individual Defendants, had final policymaking authority with respect to the cease and desist orders and the Town's decision to uphold Soto's determination that the quarry was not a legally existing, nonconforming use. Indeed, pursuant to Connecticut law, the ZBA has the power to, *inter alia*, "hear and decide appeals where it is alleged that there is an error in any order, requirement or decision made by the official charged with the enforcement of this chapter or any bylaw, ordinance or regulation adopted under the provisions of this chapter" and "to determine and vary the application of the zoning bylaws, ordinances or regulations in harmony with their general purpose and intent" with respect to a specific parcel of land provided certain criteria are met. Conn. Gen. Stat. §§ 8-6(a)(1), (3). As a legal matter, this statutory authority renders the Plaintiffs' zoning-related claims against the Town permissible under *Monell*. *See Wiltzius v. Town of New Milford*, 453 F. Supp. 2d 421, 436 (D. Conn. 2006) (holding that the plaintiff properly brought a *Monell* claim against the Town of New Milford based on the actions of its Zoning Board of Appeals, which represented official town policy).

21

However, the Town argues that Plaintiffs have not presented any evidence that the ZBA itself deprived Plaintiffs of any constitutional right, and thus Plaintiffs may not hold the Town liable under *Monell* for the acts of the ZBA.  They rely on cases in which courts in this District have held that the ZBA's authority to issue final zoning decisions precludes a finding of personal involvement in the constitutional deprivation with respect to the individual zoning officers whose acts preceded such final decisions.  *See Komondy v. Gioco*, 253 F. Supp. 3d 430, 458–59 (D. Conn. 2017) (finding that Town of Chester ZBA and not individual zoning enforcement officer was responsible for final decision of the Town once the ZBA denied the plaintiff's appeal of the denial of her permit and application for a variance following issuance of cease and desist order from ZEO, as "the ZBA is the highest official 'actor' to make a zoning decision"); *Alvarez v. Hansen*, 493 F. Supp. 2d 278, 290 (D. Conn. 2007) (concluding that plaintiff failed to show that zoning officer proximately caused ZBA's denial of his application for a zoning variance where he conceded that the ZBA and not the individual official "was the highest policy-setting official for purposes of granting . . . his application for a zoning variance").

The Court disagrees. While the ZBA's final authority may preclude a finding of personal involvement as to an individual zoning officer, an issue which is discussed, *infra*, it does not necessarily follow that the ZBA's final authority insulates the Town from liability under these circumstances.  Rather, if Plaintiffs can establish that the ZBA effectively ratified the actions of Soto or Maturo in rendering its final decision, those actions are attributable to the Town under *Monell*.  *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion) ("[W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies.

If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.").[15]

Here, the Court concludes that Plaintiffs have identified a genuine issue of material fact as to whether the ZBA ratified the actions of the individual Town officials allegedly responsible for shutting down the quarry—namely, Maturo and/or Soto.[16]  Although perhaps insufficient to create an issue of fact on its own, the decision by the ZBA to deny the Plaintiffs' appeal in the face of the 2014 Biancur decision is itself probative of ratification.  (*See* Tr., East Haven Zoning Board of Appeals Meeting Sept. 21, 2017, Pls.' Ex. MM, ECF No. 119-39.)  In addition, Soto testified that he made the decision to issue the final cease and desist order in consultation with Attorneys Joe and Al Zullo (Soto Dep. Tr. at 128:20–23, Pls.' Ex. K; *see also* Nimons Dep. Tr. at 53:14–15, Pls.' Ex. E), and it was Al Zullo who prepared the legal staff report to advise the ZBA in connection with the appeal.  (Defs.' Ex. 27, ECF No. 105-28.)  In the course of the litigation of the zoning appeal, Plaintiffs' counsel sought recusal of the Zullos' law firm from the proceedings based on, *inter alia*, its alleged conflict in both advocating on behalf of the Town and later advising the ZBA.  (*See* Pls.' Ex. EE, ECF No. 119-31; Pls.' Ex. LL at 85–88, ECF No. 119-38.)  Thus, the fact that the same attorneys who advised the ZBA may have participated in the drafting of the cease and desist orders that the ZBA was tasked with reviewing may constitute additional evidence that the ZBA ratified the decision by Soto and others to issue the challenged orders.

---

[15] Although the Second Circuit does not appear to have addressed this precise issue, this Court agrees with another court in this Circuit which observed that "[w]hile 'policymaker' status is generally determined as a matter of state law, ratification is generally a question of fact." *Field Day, LLC v. Cty. of Suffolk*, No. 04-CV-2202 (DRH) (WDW), 2005 WL 2445794, at *20 (E.D.N.Y. Sept. 30, 2005) (internal citation omitted).

[16] As Nimons is not alleged to have participated in the zoning decisions that led to the shutdown of the quarry, there is no nexus between his actions and any ratification by the ZBA that would sustain a theory of *Monell* liability with respect to his conduct.

As to the *Monell* claims arising out of Milici's conduct, none of the parties analyze the extent to which he may have possessed final policymaking authority.  However even assuming *arguendo* that his actions are chargeable to the Town, Plaintiffs' constitutional challenges to the validity of his decisions as tax assessor are precluded by principles of comity, as discussed below.

<u>First Amendment Retaliation</u>

Plaintiffs' First Amendment retaliation claim is predicated on their assertion that the adverse actions against Plaintiffs were undertaken by the Town in retaliation for Plaintiffs' successful personal property tax appeal and the appeal from the 2016 revaluation.  "A plaintiff asserting a First Amendment retaliation claim must establish that: '(1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech.'"  *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (quoting *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011)).  "Regardless of the presence of retaliatory motive, however, a defendant may be entitled to summary judgment if he can show dual motivation, *i.e.*, that even without the improper motivation the alleged retaliatory action would have occurred."  *Scott v. Coughlin*, 344 F.3d 282, 287–88 (2d Cir. 2003).  "Plaintiff has the initial burden of showing that an improper motive played a substantial part in defendant's action. The burden then shifts to defendant to show it would have taken exactly the same action absent the improper motive."  *Id.* at 288.

In their opposition, Plaintiffs clarify that their "retaliation claim is based solely on the actions of Milici." (Pls.' Mem. at 35 n.13.)  As discussed above, Plaintiffs' appeal of the Town's 2015 denial of the personal property manufacturing exemption to Plaintiffs' quarry equipment resulted in a stipulated judgment on December 21, 2016, pursuant to which the manufacturing

equipment was deemed exempt from taxation. (Defs.' Ex. 31.) The parties also stipulated that the Town would pay Plaintiffs a refund totaling $20,781.20 for taxes previously paid for the Grand List dated October 1, 2015. (*Id.* ¶ 4.) The allegedly adverse actions which followed and are attributable to Milici consist of: (1) Milici's revaluation of the Property at $2,283,780, by notice also dated December 21, 2016 (Defs.' Ex. 38); and (2) Milici's allegedly improper recording of the farmland designation on May 9, 2017 (*see* Patton Aff. ¶ 69), which Plaintiffs claim he failed to withdraw after Plaintiffs demanded that he immediately do so on June 23, 2017. Plaintiffs also contend that the farmland classification constituted retaliation for Plaintiffs' appeal of the 2016 revaluation of the Property, which is still pending, and with which the Town was served on May 2, 2017. (Pls.' Ex. FF, ECF No. 119-32.)

With respect to these events, Defendants argue that Plaintiffs are "barred by the principle of comity from asserting § 1983 actions against the validity of state tax systems in federal courts." *Fair Assessment in Real Est. Ass'n, Inc. v. McNary*, 454 U.S. 100, 116 (1981). "Such taxpayers must seek protection of their federal rights by state remedies, provided . . . that those remedies are plain, adequate, and complete[.]" *Id.* (footnote omitted). Plaintiffs respond that this rule has no application since they are not seeking review of the revaluation or farmland classification itself. (Pls.' Mem. at 38 n.15.) However, "[a]s in all other § 1983 actions, the award of . . . damages would first require a federal-court declaration that [Defendants], in administering the state tax, violated [Plaintiffs'] constitutional rights." *Fair Assessment*, 454 U.S. at 106–07. The fact that "plaintiffs' claim involves a fundamental First Amendment right" (Pls.' Mem. at 38 n.15) is therefore of no moment when adjudication of the First Amendment claim will turn on the validity of the Town's tax assessment and methods of taxation. *See Casciani v. Town of Webster*, 501 F. App'x 77, 80 (2d Cir. Nov. 7, 2012) (summary order) (concluding that "Casciani's § 1983 damages

claim is barred by the principle of comity" where he claimed "that the Town retaliated against him by raising the tax assessment on some of his properties"). And there can be no dispute that Plaintiffs have access to an adequate state court remedy as the 2016 assessment is currently on appeal in the Superior Court. Summary judgment is therefore granted in favor of the Town as well as to Milici in his individual capacity with respect to the First Amendment retaliation claim.[17]

Substantive Due Process

In their opposition Plaintiffs clarify that their Fourteenth Amendment due process claim sounds in substantive and not procedural due process. "Substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill advised." *Cunney v. Bd. of Trustees of Vill. of Grand View, N.Y.*, 660 F.3d 612, 626 (2d Cir. 2011) (quotation marks and citation omitted); *see also Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999) ("Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority."). The Second Circuit "has recognized that the substantive component of the Fourteenth Amendment's Due Process Clause forbids the government from burdening, in a constitutionally arbitrary way, an individual's property rights." *O'Connor v. Pierson*, 426 F.3d 187, 204 (2d Cir. 2005). "'[C]onstitutionally arbitrary' action for purposes of a property-based substantive due process claim is action that shocks the conscience." *Id.* "To prevail on this cause of action, plaintiffs must show that (1) [Plaintiffs] had a valid property interest . . . and that (2) defendants infringed on that property right in an arbitrary or irrational manner." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 784 (2d Cir. 2007). "[A] planning dispute

---

[17] As observed above, the Section 1983 claim in the Second Amended Complaint against the Individual Defendants is identical to the Section 1983 claims against the Town. The Court therefore addresses the claims arising out of Milici's conduct as against both the Town and Milici and does not further address the § 1983 claims against Milici.

'tainted with fundamental procedural irregularity,' like one infected by racial animus, qualifies as arbitrary or irrational and hence as a violation of a plaintiff's substantive due process rights (provided it affects a valid property interest)." *Id.* at 789 (quoting *Natale*, 170 F.3d at 262).

East Haven begrudgingly concedes that "[g]iven the decision of the trial court in the zoning appeals, the Plaintiffs have a pre-existing/non-conforming use of the Property, albeit one derived through a technicality rather than one that has been proven by objective facts." (Defs.' Mem. at 17, ECF No. 104.) *See also Firetree, Ltd. v. Norwalk*, No. 3:17-CV-1088 (MPS), 2018 WL 4398253, at *10 (D. Conn. Sept. 14, 2018) ("A prior nonconforming use constitutes a vested property right under both substantive and procedural due process.").[18] But, the Town argues, the Plaintiffs' substantive due process claim fails at step two because the Town did not act arbitrarily or irrationally and instead sought to regulate the health and safety issues presented by the operation of the quarry.

Plaintiffs argue that the Town shut down the quarry to benefit Maturo politically and that such improper political motives establish the requisite arbitrary action to prevail upon a substantive due process claim. They cite to, *inter alia*, *O'Connor*, 426 F.3d at 203, where the Second Circuit held that whether the Wethersfield Board of Education's actions in insisting that a public school teacher release his confidential medical records "shocked the conscience" could not be decided at summary judgment when the evidence, drawn in the plaintiff's favor, could support the inference that the Board acted with "culpable intent." Specifically, the Second Circuit found that the Board's conflicting reasons for requesting the medical records on which the plaintiffs' return to work was conditioned—suggesting alternatively that the Superintendent needed to view the records

---

[18] Plaintiffs also argue that the Town deprived Plaintiffs of their liberty interest in engaging in their chosen profession and of their property interest in the quarry. (Pl.'s Mem. at 22 n.5.) Because the parties do not dispute that Plaintiffs have established a protected property right, the Court need not further address this issue at this juncture.

personally and simultaneously that they were only requested to facilitate an independent examination by an outside psychologist and not for the review by any school official—precluded a finding that the Board's actions were not constitutionally arbitrary as a matter of law. *See id.* at 203–04. Thus, "[i]f the Board acted out of incompetence or confusion, this would not support substantive due process liability," whereas "if the Board acted out of spite, or to keep [the plaintiff] from teaching by whatever means necessary, then the Board's actions, . . . would shock the conscience." *Id.* at 204.

The Court agrees with Plaintiffs that the current record likewise raises issues of fact as to the Town's motivation in issuing and upholding the cease and desist orders that ultimately resulted in the shutdown of the quarry and that a reasonable fact finder could conclude that the Town acted arbitrarily or irrationally in taking the steps that it did which deprived Plaintiffs of their protected property rights. First, the Town's position that the operation of the quarry violated the zoning regulations stood in direct contradiction to the position expressed in the November 2014 Biancur decision which found that "there is no doubt that this property is a **legal pre-existing nonconforming use**" and that "there are no Zoning issues" at the Property, thus concluding that "the operation at 1 Barberry Road should continue without any interference from the Town." (Defs.' Ex. 11 (emphasis in original).) As noted previously, the Biancur decision was published in the *New Haven Register* and recorded in the Town's land records and the Connecticut Superior Court later determined that it was binding on the Town. The Town's apparently sudden effort to regulate the quarry also stood in contrast to the statements expressed in the affidavit by former ZEO George Mingione, who averred that during his tenure the Property was "not subject to any zoning enforcement actions of any kind associated with excavation and quarrying uses" and that the Property was "not required to obtain any zoning permits, special permits, Planning and Zoning

Commission approvals and/or Zoning Board of Appeals approvals for the rock excavation and quarry uses."  (G. Mingione Aff. ¶¶ 9–10, Ex. E to Pls.' Ex. FFF.)

This evidence contradicts the Town's assertion that it acted at all times only to ensure the health and safety of those affected by the quarrying activities, which is supported by evidence of complaints it received beginning in February 2017.  Thus, disputed issues of fact preclude a finding as to whether the Town in fact sought to regulate the quarry for legitimate reasons as a matter of law or whether its reasons were pretextual, fabricated, and/or politically motivated, as Plaintiffs contend.  By way of further example, Soto's cease and desist letters indicated that Plaintiffs' tree slashing activities, removal of tree stumps, and related disturbances to the soil were proscribed by Section 31 of the zoning regulations and directed Plaintiffs to apply for a special exception permit. However, Soto testified that he did not actually analyze whether the quarry was subject to Section 31's requirements, which raises the specter of pretext.  (Soto Dep. Tr. at 130:10–16, 132:4–23, Pls.' Ex. K.)  And as noted previously, Plaintiffs also point to evidence suggesting that Town Attorney Joe Zullo contemporaneously agreed with Plaintiffs that the Town could not lawfully regulate the quarry but sought to avoid displeasing then-Mayor Maturo.  (*See, e.g.*, Hughes Aff. ¶ 7, Pls.' Ex. L; Temkin Dep. Tr. at 14:19–25, 15:1–16, Pls.' Ex. B.)

Further, the parties do not dispute that Maturo's political opponent during the relevant timeframe, Carfora, was organizing community efforts to oppose the quarry.  (Defs.' LRS ¶¶ 45– 47.)  Maturo cited Carfora's efforts at a Code Enforcement Committee meeting on May 9, 2017, at which Maturo stated that blasting permits would no longer be issued to the quarry.[19]  (Pls.' Ex. W at 1.)  DiLungo also testified that a week before the Town shut down the quarry, Maturo told

---

[19] The Town challenges the reliability of the meeting minutes for the Code Enforcement Committee as not reflective of a real-time transcription of the meeting "but rather later-typed summary notes," and the Town contends that the meeting minutes were "frequently inaccurate."  (Reply at 5 n.1, ECF No. 126.)  The Town is of course entitled to challenge the admissibility and accuracy of such minutes at trial.

DiLungo that "Joe Carfora at the time was running a group of people that was going to make it bad for him and he wasn't going to lose another election like he did from the quarry on Russo Avenue." (DiLungo Dep. Tr. at 36:23–25, 37:1–2, Pls.' Ex. I.) And although Maturo testified that he could not recall directing Nimons to limit the issuance of blasting permits to Plaintiffs (Maturo Dep. Tr. at 57:21–24, Pls.' Ex. F), Brancati testified that Nimons would call him and seek the Mayor's approval each time someone from the quarry sought a blasting permit. (Brancati Dep. Tr. at 25:22–25, 26:1–13, Pls.' Ex. J.)

This is just some of the evidence that creates a genuine issue of material fact as to the question of the Town's motivation in depriving Plaintiffs of their property interest. *See, e.g.*, *Brady v. Town of Colchester*, 863 F.2d 205, 216 (2d Cir. 1988) (holding that summary judgment was improper where "the facts of this case suggest that the plaintiffs may be able to prove that they were denied a permit and use of their property not because of a good faith mistake on the part of the [Colchester Planning and Zoning Commission] about the applicable law, but because of indefensible reasons such as impermissible political animus").[20] This question is for the jury and not appropriately decided by summary judgment. While the Town argues that it had the right to regulate the quarry's nonconforming use under its police powers, citing *Taylor v. Zoning Bd. Of Appeals Of Town Of Wallingford*, 65 Conn. App. 687, 783 A.2d 526 (App. Ct. 2001), as discussed above, principles of substantive due process preclude the Town from exercising this authority in

---

[20] The Town argues that *Brady* is distinguishable because the record there contained direct evidence of improper political motivation by members of the planning and zoning committee and the record here lacks evidence that the ZBA upheld the cease and desist orders and denied Plaintiffs' appeal for impermissible reasons. (Reply at 6–7.) However as discussed, *supra*, whether or not the ZBA ratified Maturo's and/or Soto's actions and their allegedly improper motivations is a question that turns on disputed issues of fact.

an arbitrary or irrational way, *see, e.g.*, *id.* at 697.  The motion for summary judgment is denied with respect to the substantive due process claim.[21]

<u>Equal Protection</u>

"The Equal Protection Clause 'is essentially a direction that all persons similarly situated should be treated alike.'"  *Lanning v. City of Glens Falls*, 908 F.3d 19, 29 (2d Cir. 2018) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)).  A plaintiff can prevail on a theory of selective treatment based upon a showing "that (1) the [plaintiff], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."  *LeClair v. Saunders*, 627 F.2d 606, 609–10 (2d Cir. 1980).  The Supreme Court has also "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (*per curiam*).

The Town argues that Plaintiffs cannot satisfy their burden under either theory because they have not presented any evidence that they were treated differently from a similarly situated property owner in East Haven.  Plaintiffs do not respond to this argument and the Court therefore deems this claim abandoned.  *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) (explaining that "when a counseled party moves for summary judgment, 'a partial response [by the non-movant] arguing that summary judgment should be denied as to some

---

[21] Plaintiffs assert a secondary theory based on the notion that "a true pattern of harassment by government officials may make out a section 1983 claim for violation of due process of law."  *Chalfy v. Turoff*, 804 F.2d 20, 22 (2d Cir. 1986) (*per curiam*); *see also Hu v. City of New York*, 927 F.3d 81, 103 (2d Cir. 2019) ("While we have not revisited this 'pattern of harassment' theory of Due Process since deciding *Chalfy*, district courts in this Circuit have continued to treat it as a viable cause of action").  Because the Court concludes that Plaintiffs may proceed on their substantive due process claims on the theory that the Town's actions were so constitutionally arbitrary or irrational as to shock the conscience, the Court need not address this alternative theory of liability at this juncture.

claims while not mentioning others may be deemed an abandonment of the unmentioned claims.'")
(quoting *Jackson v. Federal Express*, 766 F.3d 189, 195 (2d Cir. 2014)).  The motion for summary
judgment is therefore granted as to the equal protection claim.

<u>Takings Claim</u>

The Takings Clause of the Fifth Amendment, applied to the States through the Fourteenth
Amendment, "provides that no 'private property [shall] be taken for public use, without just
compensation.'"  *1256 Hertel Ave. Assocs., LLC v. Calloway*, 761 F.3d 252, 261 (2d Cir. 2014)
(quoting U.S. Const. amend. V).  "The Supreme Court has recognized two branches of Takings
Clause cases: physical takings and regulatory takings." *Id.* at 263.   "A physical taking occurs
when there is either a condemnation or a physical appropriation of property," whereas a regulatory
taking "occurs where even absent a direct physical appropriation, governmental regulation of
private property 'goes too far' and is 'tantamount to a direct appropriation or ouster.'" *Id*. (quoting
*Lingle v. Chevron U.S.A., Inc*., 544 U.S. 528, 537 (2005)).   "The Supreme Court has 'generally
eschewed any set formula' for identifying regulatory takings, instead 'preferring to engage in
essentially ad hoc, factual inquiries' to determine in each case whether the challenged property
restriction rises to the level of a taking."  *Id.* at 264 (quoting *Lucas v. S.C. Coastal Council*, 505
U.S. 1003, 1015 (1992)).[22]

Here, Plaintiffs assert a regulatory taking as a result of the issuance of the cease and desist
orders and the ZBA's affirmance of same.  The Town first argues that any such claim is not ripe

---

[22] Article First, Section 11 of the Connecticut Constitution similarly provides: "The property of no person shall be
taken for public use, without just compensation therefor."  Conn. Const. art. I, § 11.  The Connecticut Supreme Court
applies the same analysis to inverse condemnation (i.e., regulatory taking) claims brought under the state constitution
as is applied to takings claims brought under the federal constitution.  *See Bauer v. Waste Mgmt. of Connecticut, Inc.*,
234 Conn. 221, 250 n.16, 662 A.2d 1179 (1995) (observing that "we have never interpreted the two provisions to
require different analysis" and "therefore assum[ing] for the purposes of this appeal that article first, § 11, provides
the same protection for property owners as that provided for under its federal analogue").  The same analysis that the
Court undertakes with respect to Plaintiffs' takings claim in Count One therefore applies to the Court's disposition of
the Plaintiffs' inverse condemnation claim in Count Two.

for judicial review because Plaintiffs never applied for and were therefore never denied a permit. It relies upon *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 127 (1985), where the Supreme Court stated that "[o]nly when a permit is denied and the effect of the denial is to prevent 'economically viable' use of the land in question can it be said that a taking has occurred." *Riverside* concerned the statutory authority of the Army Corps of Engineers to regulate certain wetlands under the Clean Water Act. The Supreme Court concluded that the Takings Clause was not implicated by a construction of the Clean Water Act which would allow the Corps to require that property owners obtain permits before placing fill on their property, because merely requiring that a permit be obtained in the first instance does not amount to a taking. *See id.* at 126–27. This principle has no application here. The Superior Court concluded that the quarry is not subject to Section 31, to include any requirement that the quarry obtain a permit to operate, so it is absurd to propose that the failure to seek a permit, when no permit was required, renders this claim not ripe. The question is instead whether the ZBA's decision to uphold the cease and desist orders effected a regulatory taking of the quarry during the time that it remained shut down while the appeal to the Superior Court was pending.

The Town next cites *MacDonald, Sommer & Frates v. Yolo Cty.*, 477 U.S. 340, 348 (1986), where the Supreme Court explained that "[i]t follows from the nature of a regulatory takings claim that an essential prerequisite to its assertion is a final and authoritative determination of the type and intensity of development legally permitted on the subject property" and therefore that "[a] court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." As the Second Circuit has explained, "[r]equiring a property owner to obtain a final, definitive position from zoning authorities evinces the judiciary's appreciation that land use disputes are uniquely matters of local concern more aptly suited for local resolution." *Murphy v.*

*New Milford Zoning Comm'n*, 402 F.3d 342, 348 (2d Cir. 2005).[23]  From this proposition, the Town argues that because the Superior Court overturned the Town's final decision, the Property is no longer subject to any zoning restrictions and there is no existing regulation that could constitute a taking.  This argument also misses the mark.  The question is whether Plaintiffs have presented a triable issue as to whether the Town effected a temporary taking for which Plaintiffs are entitled to compensation during the time that the quarry remained inoperable.[24] The existence, or not, of a currently applicable zoning regulation, is irrelevant to this inquiry.

Finally, citing *Lingle*, the Town argues that its effort to regulate the quarry, which was later deemed unlawful by the Superior Court, cannot be a taking because the Takings Clause applies only to *proper* government interference with property rights.   In *Lingle*, the Supreme Court rejected a prior doctrine that had defined a taking in terms of whether the challenged regulation "does not substantially advance legitimate state interests" as improperly conflating due process and takings standards, noting that the Takings Clause "does not bar government from interfering with property rights, but rather requires compensation 'in the event of *otherwise proper interference* amounting to a taking.'"  544 U.S. at 540, 543 (quoting *First Eng. Evangelical Lutheran Church of Glendale v. Los Angeles Cty.*, 482 U.S. 304, 315 (1987)) (emphasis in

---

[23] In *Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162 (2019), the Supreme Court overturned the precedent established in *Williamson Cty. Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), which had held that property owners cannot bring takings claims in federal court until the claim is exhausted in state court.   However *Knick* did not overturn the separate "finality" requirement identified by the Town here.  *See Sagaponack Realty, LLC v. Vill. of Sagaponack*, 778 F. App'x 63, 64 (2d Cir. Oct. 4, 2019) (summary order) (explaining that "*Knick* leaves undisturbed the first prong, that a state regulatory agency must render a final decision on a matter before a taking claim can proceed.").

[24] In *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 342 (2002), the Supreme Court held, with respect to claims alleging a temporary as opposed to permanent regulatory taking, "that the interest in 'fairness and justice' will be best served by relying on the familiar *Penn Central* approach when deciding cases like this."   That approach counsels courts to consider several factors in assessing whether a regulatory action constitutes a taking, "including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action."  *Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017) (citing *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978)).

original).  This statement, on which the Town now relies, was made in the context of explaining why an inquiry into the purpose and effectiveness of an underlying regulation is not a meaningful proxy for determining whether that regulation effects a taking—not, as now asserted, as a limitation on the type of government action that could effect a taking in the first instance. However, neither the Supreme Court nor the Second Circuit has reached the question of whether improper government interference categorically immunizes the government from a takings claim, as the Town asserts.

Plaintiffs respond by citing to law review articles that refute such a notion and predict that the Supreme Court, if confronted with the issue, "would likely reject an errors-preclude-takings position."  David W. Spohr, *"What Shall We Do with the Drunken Sailor?": The Intersection of the Takings Clause and the Character, Merit, or Impropriety of Regulatory Action*, 17 Southeastern Envtl. L.J. 1, 57–58 (2008) (asserting that "Lingle's unanimous opinion was dismissing the notion that the impermissibility of government action could be an independent basis for a takings claim, not commenting on whether that impermissibility precluded a taking" and arguing that the Supreme Court's observation that an inquiry into a regulation's validity "'is logically prior to and distinct from the question whether a regulation effects a taking,' at least impl[ies] that invalidity would not necessarily preclude a later takings claim") (quoting *Lingle*, 544 U.S. at 543).  Absent some direction from the Second Circuit, or from the Supreme Court itself, this Court declines "to undertake the hazardous task of elevating silence to the level of stare decisis," where the question presented "was not before the [*Lingle* Court]."  *U. S. ex rel. Newsome v. Malcolm*, 492 F.2d 1166, 1171 (2d Cir. 1974), *aff'd sub nom. Lefkowitz v. Newsome*, 420 U.S. 283 (1975).  In allowing both the substantive due process and takings claims to proceed to trial, the Court notes that to the extent a jury were to conclude that the Town's actions in

regulating the quarry were constitutionally arbitrary or irrational, Plaintiffs may be entitled to recovery for a substantive due process violation. To the extent a jury were to conclude that the Town's conduct did not violate the Due Process Clause but that the temporary cessation of quarrying activity at the Property constituted a taking for which Plaintiffs are entitled to just compensation, Plaintiffs may be entitled to recovery for a takings violation. Although Plaintiffs may not prevail on both a substantive due process claim and Takings Clause claim, they may proceed on these alternative theories of liability at this juncture, especially where the Town continues to defend the validity of its actions.[25] The motion for summary judgment as to the Takings Claim in Count One and the Inverse Condemnation Claim in Count Two is denied.[26]

### *Municipal Estoppel*

Plaintiffs also assert a claim sounding in municipal estoppel against East Haven. As the Connecticut Supreme Court has held:

> in order for a court to invoke municipal estoppel, the aggrieved party must establish that: (1) an authorized agent of the municipality had done or said something calculated or intended to induce the party to believe that certain facts existed and to act on that belief; (2) the party had exercised due diligence to ascertain the truth and not only lacked knowledge of the true state of things, but also had no convenient means of acquiring that knowledge; (3) the party had changed its position in reliance on those facts; and (4) the party would be subjected to a substantial loss if the municipality were permitted to negate the acts of its agents.

---

[25] To be clear, if the Plaintiffs prevail on the substantive due process claim, they cannot also prevail on the Takings Clause claim. *See Lingle*, 544 U.S. at 543 ("[I]f a government action is found to be impermissible—for instance because it . . . is so arbitrary as to violate due process—that is the end of the inquiry. No amount of compensation can authorize such action.")

[26] In its reply the Town argues, for the first time, that the temporary loss of profits and business activity does not constitute a taking. The Town cites *Daugherty Speedway, Inc. v. Freeland*, No. 4:20-CV-36 (PPS), 2021 WL 633106, at *5 (N.D. Ind. Feb. 17, 2021), where a district court held that the allegation that executive orders issued by the Governor of Indiana during the COVID-19 pandemic that resulted in the closure of the plaintiff's racetrack and the loss of profits for two days failed to state a Takings Clause claim. As the parties have not briefed this issue, the Court declines to entertain an issue not raised in the Town's opening memorandum of law. *See* D. Conn. L.R. 7(d) ("A reply memorandum must be strictly confined to a discussion of matters raised by, and must contain references to the pages of, the memorandum to which it replies.").

*Cortese v. Plan. & Zoning Bd. of Appeals of Town of Greenwich*, 274 Conn. 411, 418, 876 A.2d 540 (2005) (quoting *Bauer*, 234 Conn. at 247). "In municipal zoning cases, however, estoppel may be invoked (1) only with great caution, (2) only when the resulting violation has been unjustifiably induced by an agent having authority in such matters, and (3) only when special circumstances make it highly inequitable or oppressive to enforce the regulations." *Id*. (quoting *Bauer*, 234 Conn. at 247).

Because Plaintiffs' municipal estoppel claim is based on Plaintiffs' reliance on the 2014 Biancur decision and because the Superior Court has resolved that issue in the Plaintiffs' favor, the Town argues that Plaintiffs' municipal estoppel claim is moot, as there is no longer any relief to which Plaintiffs are entitled. Plaintiffs respond that the claim is not moot because they can still seek damages, as municipal estoppel is the equivalent of a claim sounding in promissory estoppel against a municipality, and damages are recoverable under a promissory estoppel theory of liability. *See Levine v. Town of Sterling*, 300 Conn. 521, 534 n.11, 16 A.3d 664 (2011) (where "[t]he plaintiff brought separate claims of promissory estoppel and municipal estoppel," the court stated that it "agree[d] with the trial court that a claim of municipal estoppel is an action for promissory estoppel against a municipality, and treat these claims as one"). In reply, the Town emphasizes that Plaintiffs have not identified any cases in which damages were awarded on a promissory estoppel theory against a municipality, though they acknowledge that the Superior Court has at least on one occasion entertained the notion in dictum. *See Munch v. Town of Sherman*, No. CV054002878S, 2006 WL 2053875, at *3 n.5 (Conn. Super. Ct. July 10, 2006) ("Although the plaintiff cites no precedent for obtaining money damages from a municipality on a promissory estoppel theory, the defendants do not invoke municipal immunity on this count or

37

present any other reason why, in principle, a party cannot sue a municipality for damages on this theory.").

The Town also cites *Lawrence Brunoli, Inc. v. Town of Branford*, 247 Conn. 407, 411, 722 A.2d 271 (1999), where the Connecticut Supreme Court held "that, as a matter of law, an unsuccessful bidder to a municipal contract has no standing to assert a cause of action for money damages for failure of the municipality to follow its competitive bidding laws, regardless of whether the plaintiff alleges fraud, corruption or favoritism." However this decision was based upon considerations germane to Connecticut's municipal bidding statutes, which confer standing in limited circumstances upon unsuccessful bidders, who would otherwise lack "standing to challenge the award of a public contract." *See id.* at 412–13. Promissory estoppel, by contrast, derives at common law, and "Connecticut . . . follows the approach of the Restatement (Second) of Contracts" in defining its contours, "under which 'full-scale enforcement by normal remedies is often appropriate.'" *Brookridge Funding Corp. v. Nw. Hum. Res., Inc.*, 170 F. App'x 170, 172 (2d Cir. Mar. 2, 2006) (summary order) (quoting Restatement (Second) of Contracts § 90 cmt. d). The Court is therefore not convinced that, if faced with this question, the Connecticut Supreme Court would deem a damages remedy inapplicable to a municipal estoppel claim.

The Town also argues for the first time in its reply brief and in rather conclusory fashion that Plaintiffs have set forth insufficient facts to prevail upon a municipal estoppel claim. The Court disagrees. Whether the Biancur decision was calculated or intended to induce action on the part of the Plaintiffs, whether Plaintiffs changed course in reliance upon the Biancur decision and, if so, whether they exercised due diligence in doing so, and whether the Town's reneging on the Biancur decision caused Plaintiffs to suffer a substantial loss are all inherently fact-bound

38

inquiries, appropriately decided by the jury.  The motion for summary judgment with respect to the municipal estoppel claim is denied.

### The Individual Defendants' Motion for Summary Judgment

#### *Section 1983 Claim—Count One*

The Individual Defendants adopt the Town's substantive arguments with respect to Plaintiffs' federal constitutional claims, which the Court has previously addressed.  The Court's determination that questions of fact preclude summary judgment on the claims against the Town has equal application to the claims against the Individual Defendants—specifically, Maturo and Soto.

But the Individual Defendants also assert that summary judgment should be awarded in their favor because Plaintiffs cannot establish that each was personally involved in the alleged constitutional deprivations, and because they are entitled to qualified immunity.  The Court addresses these arguments with respect to Maturo, Nimons, and Soto, who are the only Defendants alleged to have participated in the substantive due process violations and unlawful takings that underlie Plaintiffs' remaining Section 1983 claims.[27]

"A defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority."  *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016), *as amended* (Feb. 24, 2016) (quotation marks and citation omitted).  "Rather, the personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  *Id.*  (quotation marks and citation omitted).  "The Second Circuit has recently held that 'after *Iqbal*, there is no special rule for supervisory liability,' and instead, 'the violation must be established against the supervisory official directly.'"  *Burton v.*

---

[27] As decided *supra*, all Section 1983 claims against Milici are barred by principles of comity and summary judgment entered in his favor.

*Salerno*, No. 3:20-CV-1926 (VAB), 2021 WL 3493621, at *8 (D. Conn. Aug. 9, 2021) (quoting *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020)). "Therefore, in order to demonstrate personal involvement under section 1983, 'a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Id.* (quoting *Tangreti*, 983 F.3d at 618 (quoting *Iqbal*, 556 U.S. at 676)) (internal quotation marks omitted). "Once a plaintiff properly alleges that a defendant was personally involved in a constitutional deprivation, he or she 'must also establish that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation.'" *Id.* (quoting *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014)).

As noted previously, courts in this District have recognized that a zoning board of appeal's independent review of a decision rendered by a zoning officer defeats a finding of personal involvement as to that zoning officer, as the ZBA in such circumstance assumes responsibility for the final challenged decision. *See Komondy*, 253 F. Supp. 3d at 457–58; *Alvarez*, 493 F. Supp. 2d at 290. Plaintiffs respond that *Komondy* and *Alvarez* are distinguishable because in each the plaintiff sought a permit or variance for an otherwise prohibited use whereas here, the Individual Defendants' acts immediately deprived Plaintiffs of a pre-existing property right. The Court also observes that in *Alvarez*, the district court did not hold categorically that the ZBA's decision prevented a finding of personal involvement but, rather, analyzed whether the acts of each individual defendant could have proximately caused the ZBA's denial of the plaintiff's applications. *See id.* at 287–90.

The Court agrees that the ZBA's final decision did not supersede the individual actions of these Defendants as a matter of law under these circumstances. For example, there is evidence that Maturo directed the conduct that resulted in the shutdown of the quarry, to include notes from

the Code Enforcement Committee Meeting on May 9, 2017 that memorialize Maturo's alleged statement that "there is no blasting going on because no permits have been given and will not be given." (Pls.' Ex. W at 1.) Soto issued the cease and desist order that same day—May 9, 2017, citing a regulation that he admittedly had not analyzed to see whether it was applicable. If this conduct was motivated by political ambitions so as to meet the substantive due process standard, then Maturo's and Soto's involvement in the constitutional deprivation is established. Indeed, the quarry was shut down at first, it is alleged, by Maturo and Soto, well before the ZBA had any involvement in the decision. As Plaintiffs correctly observe, it was at that point in time when the alleged constitutional deprivation occurred, unlike those circumstances where the deprivation does not occur until the final decision of the ZBA. Finally, whether the ZBA's approval of the orders insulates the Town from *Monell* liability arising out of Maturo's and Soto's conduct is a different inquiry from and does not control the inquiry into whether these Defendants are directly liable for their own, allegedly unconstitutional actions.

Further, as discussed previously, there are disputed questions of fact as to whether the ZBA effectively ratified the actions of Soto or Maturo in approving the cease and desist orders regarding the quarry and these disputed issues likewise preclude the entry of summary judgment on the issue of personal involvement. If the ZBA is determined to have ratified the conduct of Maturo and/or Soto, and the jury determines that such conduct established either a substantive due process or Takings Clause violation, then it is axiomatic that Soto and Maturo violated the Plaintiffs' rights. Finally, when the evidence is sufficient to permit the inference that the action of a final decisionmaker was a "normal or foreseeable consequence" of an individual defendant's actions, it is for the jury to decide whether those defendant's actions standing alone were sufficient to cause the alleged constitutional violation. *See Back v. Hastings on Hudson Union Free Sch. Dist.*, 365

F.3d 107, 126 (2d Cir. 2004). The Court accordingly finds genuine issues of material fact regarding Maturo's and Soto's personal involvement in the alleged constitutional deprivations so as to render summary judgment improper on this basis. [28]

As noted previously, Defendants also argue that they are entitled to qualified immunity, which "protects government officials from suit if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The shield of qualified immunity insulates government enforcement officials from liability in their individual capacities unless the plaintiff demonstrates "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ganek v. Leibowitz*, 874 F.3d 73, 80 (2d Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow*, 457 U.S. at 818)). However, "[i]n this Circuit, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Southerland v. City of New York*, 680 F.3d 127, 141 (2d Cir. 2012) (quoting *Taravella v. Town of Wolcott*, 599 F.3d 129, 134 (2d Cir. 2010) (brackets omitted)).

With respect to the first issue, the Court has already concluded that the question of whether Soto and Maturo violated the Takings Clause and Plaintiffs' substantive due process rights must be resolved by the trier of fact. At the second step Defendants do not argue that the rights that

---

[28] The Court need not decide whether Nimons was personally involved in any alleged constitutional deprivation in light of the Court's conclusion, discussed *infra*, that he is entitled to qualified immunity. Plaintiffs construe Defendants' personal involvement argument as extending only to Maturo and Soto (Pl.'s Mem. at 20 n.7, ECF No. 117) and Defendants respond in somewhat circular fashion that "[i]t appears that the Plaintiffs are limiting their claim for personal involvement related to the ZBA to Maturo and Soto." (Defs.' Reply at 5, ECF No. 127.) That the parties have not adequately briefed the issue of Nimons's personal involvement further informs the Court's decision not to address this issue.

were allegedly violated were not clearly established and instead assert that Defendants' actions were objectively reasonable so as to warrant a grant of qualified immunity.

Beginning with Soto, Defendants argue that the fact that the Superior Court later determined that his actions in issuing the cease and desist orders were incorrect does not render them objectively unreasonable, as he believed at the time that he was advancing the Town's legitimate interest in regulating health and safety issues presented by the Property. However, largely for the reasons previously articulated, the Court finds that Plaintiffs have identified a disputed issue of material fact as to Soto's motivations in issuing the orders. For example, Soto testified that he could not remember any event that took place between his issuance of the second cease and desist order on April 21 and May 2, 2017, when the Town was served with Plaintiffs' tax appeal, that would have warranted issuance of the subsequent cease and desist order that ultimately led to the shutdown of the quarry. (Soto Dep. Tr. at 78:21–24, Pls.' Ex. K.) Soto also testified that in instructing Plaintiffs to apply for a permit under Section 31, he did not actually analyze whether the quarry could operate under Section 31's requirements—thus calling into question the veracity of the representations in the cease and desist letters. (*See id.* at 130:10–16, 132:4–6, 22–23.) Patton also claims that Soto acknowledged that the November 2014 Biancur decision was binding on the Town during an April 25, 2017 meeting at the quarry. (Patton Aff. ¶ 70.) The Court finds that Plaintiffs are entitled to have a jury decide whether Soto's actions were objectively reasonable.

Defendants also argue that there is insufficient evidence to suggest that Maturo was responsible for any of the decisions upon which Plaintiffs' Section 1983 claims are based and to the extent such evidence exists, his participation in these decisions reflected an objectively reasonable effort to advance the health and safety of the Town. Again, the Court finds that disputed

issues of fact prevent the entry of summary judgment on this basis given the evidence Plaintiffs have identified regarding Maturo's purported political motivations and influence over the relevant Town officials responsible for regulating the quarry.

As for Nimons, however, the Court agrees with Defendants that it was objectively reasonable for him to stop issuing blasting permits in the face of the cease and desist orders. Plaintiffs argue that "[t]he only reason Nimons has offered for refusing to issue a blasting permit is Maturo's order to shut down the Quarry." (Pls.' Mem. at 29.) Nimons testfied that he made the decision to stop issuing blasting permits at "the meeting that took place when the cease and desist order was to be given out stopping all work up on the site"—*i.e.*, at the May 9, 2017 Code Enforcement Committee meeting. (*See* Nimons Dep. Tr. at 43:1–5, Pls.' Ex. E.) Consistent with Nimons's expectations, that same day, Soto instructed Plaintiffs on behalf of the Town that "all operations must cease **immediately** upon your receipt of this letter" and that "[f]ailure to do so immediately can result in the assessment of fines and/or criminal penalties." (Defs.' Ex. 24 at 2 (emphasis in original).) It is far-fetched, at the least, to suggest that a reasonable official in Nimons's position would have continued to issue blasting permits under such circumstances. Nimons is therefore entitled to qualified immunity with respect to Plaintiffs' constitutional claims.[29]

### Civil Conspiracy—Count Three

"The elements of a civil action for conspiracy are: (1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the

---

[29] To the extent Plaintiffs seek to hold Nimons liable for reducing the time limits on Plaintiffs' permits from 30 days to one day, Defendants correctly observe that Plaintiffs fail to explain how any such reduction in time could have given rise to a substantive violation of Plaintiffs' rights. And Plaintiffs do not appear to pursue this theory in their opposition.

object, (4) which act results in damage to the plaintiff." *Macomber v. Travelers Prop. & Cas. Corp.*, 277 Conn. 617, 635–36, 894 A.2d 240 (2006) (quoting *Harp v. King*, 266 Conn. 747, 779, 835 A.2d 953 (2003)).  "There is, however, 'no independent claim of civil conspiracy. Rather, the action is for damages caused *by acts committed pursuant to a formed conspiracy* rather than by the conspiracy itself. . . . Thus, to state a cause of action, a claim of civil conspiracy must be joined with an allegation of a substantive tort.'" *Id.* (quoting *Harp*, 266 Conn. at 779 n.37).

Defendants argue that because the record lacks sufficient evidence to sustain any underlying tort, Plaintiffs necessarily are precluded from proceeding on a theory of civil conspiracy.  Plaintiffs offer only a cursory defense of their civil conspiracy claim brought in Count Three, devoting less than a page of their 41-page brief to the effort.  And, of some significant concern, in citing *Macomber*, the Plaintiffs insert an ellipsis where the language, "There is, however, 'no independent claim of civil conspiracy,'" appears in that decision's exposition.  (Pls.' Mem. at 33.)  Further, while acknowledging that the conspiracy claim must be tied to a substantive tort, Plaintiffs do not address the fact that they have pled the conspiracy as a standalone count without actually joining it to a specific tort.  To avoid the obvious pitfalls of the manner by which the claim was brought, they summarily, and without analysis or citation to case law, assert that the torts alleged in Counts One and Four through Ten serve as the underlying tort.

The problem with this argument is that Count Three only incorporates the allegations from Count One, which alleges the constitutional claims brought pursuant to Section 1983. Accordingly, as pled, Counts Four through Ten are not implicated in the civil conspiracy count at all.  And an opposition to a motion for summary judgment is not the appropriate time to amend the pleadings.  *See, e.g.*, *AT Engine Controls Ltd. v. Goodrich Pump & Engine Control Sys., Inc.*, No. 3:10-CV-01539 (JAM), 2014 WL 7270160, at *18 (D. Conn. Dec. 18, 2014) ("It is axiomatic

that a plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.") (quotation marks and citation omitted).

Though not cited or argued by the Plaintiffs, the Court observes that in order to state a Section 1983 conspiracy claim, the "plaintiff must allege: '(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.'" *Bullard v. City of New York*, 240 F. Supp. 2d 292, 301 (S.D.N.Y. 2003) (quoting *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)).  "A § 1983 conspiracy claim must be based on an underlying violation of one or more constitutional rights."  *Biswas v. City of New York*, 973 F. Supp. 2d 504, 533 (S.D.N.Y. 2013).  A Section 1983 conspiracy claim is accordingly a matter of federal law.  Count Three purports to be a civil conspiracy claim under state law.

Because Count Three alleges no specific tort which is the object of the conspiracy as required under Connecticut law and because there is no basis upon which to construe Count Three as a Section 1983 conspiracy, the motion for summary judgment as to Count Three is granted.

### Intentional, Willful and Malicious Conduct and Prima Facie Tort—Counts Four, Five, and Six

In Count Four, Plaintiffs allege in conclusory fashion that "Defendants are liable for intentionally, willfully, and maliciously causing harm to plaintiffs and to plaintiffs' property interests."[30]  In Count Five, Plaintiffs similarly allege that "[p]ursuant to the principles of prima facie tort set forth in Restatement (Second) Torts § 870, defendants are liable for intentionally causing injury to plaintiffs."  And Count Six alleges that "[p]ursuant to the principles of prima

---

[30] This statement is attributed to paragraph 83 but the paragraph numbers beginning on page 15 of the Seconded Amended Complaint are erroneously duplicated and therefore misnumbered.  For instance, paragraph 83 also appears under the headings for Counts Five through Ten.

facie tort set forth in Restatement (Second) Torts § 871, defendants are liable for intentionally causing harm to plaintiffs' property interests."

As explained in the Restatement (Second) of Torts, Section 870 encompasses what is often referred to as the "prima facie tort" doctrine, and its commentary "is intended to serve as a guide for determining when liability should be imposed for harm that was intentionally inflicted, even though the conduct does not come within the requirements of one of the well established and named intentional torts." Restatement (Second) of Torts § 870 cmt. a. (1979). Section 871, which provides for a cause of action for an intentional deprivation or injury to a legally protected property interest by an actor whose "conduct is generally culpable and not justifiable under the circumstances," states that it "is a particularized application of the general principle for intentional torts set out in § 870" and accordingly references "that Section and its comments." Restatement (Second) of Torts § 871 cmt. a (1979).

Although the Connecticut Supreme Court has not addressed this issue, the Connecticut Superior Court has frequently recognized that "liability exists for 'prima facie tort' only if 'the actor's conduct does not come within a traditional category of tort liability.'" *Stevens v. Kahlily*, No. HHDCV176082965S, 2019 WL 4668156, at *3 (Conn. Super. Ct. Aug. 21, 2019) (quoting Restatement (Second) of Torts § 870 and citing cases); *see also Grigorenko v. Pauls*, 297 F. Supp. 2d 446, 450 (D. Conn. 2003) (observing that the prima facie tort doctrine "is essentially unknown to modern tort law in Connecticut"). Because the Plaintiffs here have asserted other "traditional tort claims that, if the allegations were proven, would adequately govern the alleged conduct" (Defs.' Mem. at 22, ECF No. 101), the Court agrees with the Defendants that Plaintiffs may not

proceed independently on a prima facie tort theory of liability in Count Five and Six.[31]  *See, e.g.*, *Choy v. Boyne*, No. CV065005693, 2006 WL 3692067, at *1 (Conn. Super. Ct. Nov. 30, 2006) (granting motion to strike prima facie tort claim where "the alleged conduct falls within the traditional tort of defamation").  This is especially true where the Second Amended Complaint fails to identify any specific conduct of the Defendants that the Plaintiffs believe is actionable under an intentional tort theory and is not otherwise encompassed in their other claims.[32]

The same conclusion holds with respect to Count Four, which charges Defendants with intentional, willful, and malicious conduct without setting forth the facts and corresponding theory to support this claim.  Defendants are accordingly entitled to summary judgment on Counts Four, Five, and Six.

### Statutory Theft Pursuant to Conn. Gen. Stat. § 52-564 and Conversion—Counts Seven and Eight

"Conversion is an unauthorized assumption and exercise of the right of ownership over property belonging to another, to the exclusion of the owner's rights."  *Mystic Color Lab, Inc. v. Auctions Worldwide, LLC*, 284 Conn. 408, 418, 934 A.2d 227 (2007).  "Similarly, statutory theft is the stealing of another's property or the knowing receipt and concealment of stolen property."  *Id.* (citing Conn. Gen. Stat. § 52-564[33]).  The Connecticut Supreme Court has recognized "that statutory theft under § 52-564 'is synonymous with the crime of larceny' as defined in General

---

[31] Although Defendants do not specifically address Count Six in their opening brief they clarify in reply that their arguments with respect to Count Five apply equally to Count Six.  (Defs.' Reply at 9.)

[32] Plaintiffs also assert that Defendants' argument with respect to their *prima facie* tort claims "is premature, because the Court's determination as to whether other torts govern defendants' conduct should be preceded by the Court's decision as to whether plaintiffs are entitled to relief under the other tort counts alleged in the complaint."  (Pls.' Mem. at 34.)  The Court has, however, permitted Plaintiffs' substantive due process and takings claims to proceed pursuant to Section 1983, which statute the Supreme Court has "repeatedly noted . . . creates a species of tort liability."  *Heck v. Humphrey*, 512 U.S. 477, 483 (1994).  It is likewise unclear to the Court how Plaintiffs seek to hold Defendants liable under a *prima facie* tort theory for conduct that is distinct from that which underlies their 1983 claims.

[33] The statute provides that "[a]ny person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages."  Conn. Gen. Stat. § 52-564.

Statutes § 53a-119." *Id.* at 418 n.14 (quoting *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 44, 761 A.2d 1268 (2000)).  "Statutory theft, however, requires an element over and above what is necessary to prove conversion, namely, that the defendant intentionally deprived the complaining party of his or her property." *Id.* at 418–19.

Defendants argue that these claims cannot proceed because Defendants "did not steal or appropriate the Plaintiffs' property, intentionally or otherwise," and "[a]t no point did any individual Defendant possess any property of the Plaintiffs."  (Defs.' Mem. at 22.)  Plaintiffs respond by citing to the definition of larceny under the Connecticut Penal Code.  They point to the definition of "obtain" which "includes, but is not limited to, the bringing about of a transfer or purported transfer of property or of a legal interest therein, whether to the obtainer or another." Conn. Gen. Stat. § 53a-118(a)(2).  They also emphasize that "[t]o 'deprive' another of property" is defined as "to withhold it or cause it to be withheld from him permanently or for so extended a period or under such circumstances that the major portion of its economic value or benefit is lost to him, or . . . to dispose of the property in such manner or under such circumstances as to render it unlikely that an owner will recover such property." *Id.* § 53a-118(a)(3).  Finally, Plaintiffs look to the definition of "to 'appropriate' property of another to oneself or a third person," which means "to exercise control over it, or to aid a third person to exercise control over it, permanently or for so extended a period or under such circumstances as to acquire the major portion of its economic value or benefit, or . . . to dispose of the property for the benefit of oneself or a third person." *Id.* § 53a-118(a)(4).  Plaintiffs, however, do not identify any case law in support of the idea that a zoning decision by a town and its officials can become actionable as statutory theft or conversion.

Moreover, Plaintiffs' position ignores the fact that "a defendant must be alleged to have possessed the property to be the proper defendant in a conversion action." *Vossbrinck v. Eckert*

*Seamans Cherin, & Mellott, LLC*, 301 F. Supp. 3d 381, 389 (D. Conn. 2018).  "In the absence of actual possession, the only possible way to recover for conversion . . . is to show 'constructive possession' of the personal property."  *Id.* at 390.  "Indeed, the underlying question in a conversion action is whether the defendant without authorization, assumes and exercises the *right of ownership* over property belonging to another, to the exclusion of the owner's rights." *Id.* (citing *Coleman v. Francis*, 102 Conn. 612, 129 A. 718, 720 (1925) (emphasis in original)) (internal quotation marks omitted).  Because the record does not contain any evidence that the Individual Defendants retained either actual or constructive possession of the Property or exercised a right of ownership to the exclusion of the Plaintiffs' rights, the Court agrees with Defendants that the tort of conversion is inapposite.  For similar reasons, Plaintiffs cannot prevail on their claim of statutory theft.  *See id.* at 391 ("For the same reasons that Plaintiff's conversion claim fails, his civil theft claim fails too.").  Summary judgment is granted to the Individual Defendants with respect to Counts Seven and Eight.

### *Tortious Interference with Contractual Relationships and Tortious Interference with Business Expectancies—Counts Nine and Ten*

"A claim for intentional interference with contractual relations requires the plaintiff to establish:   (1)   the existence of a contractual or beneficial relationship;   (2)   the   defendant's knowledge of that relationship; (3) the defendant's intent to interfere with the relationship; (4) that the interference was tortious;  and  (5) a loss suffered by the plaintiff that was cause by the defendant's tortious conduct."  *Rioux v. Barry*, 283 Conn. 338, 351, 927 A.2d 304 (2007).  And "the elements of a claim for tortious interference with business expectancies are: (1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss."  *Hi-Ho Tower, Inc.*, 255 Conn. at 27.

50

> [I]n an action for tortious interference, not every act that disturbs a contract or business expectancy is actionable.  For a plaintiff successfully to prosecute an action for tortious interference it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously.

*Landmark Inv. Grp., LLC v. CALCO Const. & Dev. Co.*, 318 Conn. 847, 868, 124 A.3d 847 (2015)

(quotation marks, citations, and alterations omitted).

The Individual Defendants argue that because the record fails to disclose the Defendants' knowledge of any contractual or business relationship between Plaintiffs and any third party or parties, the Defendants necessarily could not be found to have intentionally interfered with such unidentified contracts or business expectancies.   As for Count Nine, Plaintiffs respond that Defendants' knowledge of their disruption of Plaintiffs' contracts can inferred from circumstantial evidence—namely, Defendants' knowledge that by shutting down the quarry, Plaintiffs would become unable to supply their customers.   According to Patton, as a result of the shutdown, Plaintiffs "lost all of their existing customers after having to inform them that they could not deliver stone in accordance with contractual obligations."  (Patton Aff. ¶ 90.)  Plaintiffs similarly argue in regard to Count Ten that "[r]egardless of whether defendants knew of specific potential busines[s] opportunities, . . . defendants' general interference with plaintiffs' business by closing the Quarry is sufficient to survive summary judgment."  (Pls.' Mem. at 39.)

With respect to Count Nine, the Court agrees with the Defendants that the record does not afford a sufficient basis for the factfinder to conclude that Defendants were aware of a specific contract with which they interfered—a necessary precondition to a tortious interference with claim—as the record fails to identify the existence of *any* contract between Plaintiffs and their customers or any other party.  *See S. Home Care Servs., Inc. v. Visiting Nurse Servs., Inc. of S. Connecticut*, No. 3:13-CV-00792 (RNC), 2015 WL 4509425, at *11 (D. Conn. July 24, 2015)

(concluding that "general knowledge of the industry cannot substitute for 'actual knowledge of a specific contract,'" as Connecticut case law "makes it clear that liability depends on 'actual knowledge' of the 'particular contractual provision' alleged to have been violated") (citations omitted).  Summary judgment is accordingly granted to the Individual Defendants on Count Nine.

With respect to Count Ten, Plaintiffs observe that "besides a tort for interference with an actual contract, or with a business relationship offering the prospect of future profit, there could be an action for loss of prospective business advantage, broadly understood."  *TMK Assocs. v. Landmark Dev. Grp.,* No. 562077, 2003 WL 22133151, at *9 (Conn. Super. Ct. Aug. 21, 2003).  On this issue Patton avers that Plaintiffs have "lost ongoing and future business opportunities, lease payments, goodwill and lost profits, totaling tens of millions of dollars in losses."  (Patton Aff. ¶ 90.)  He states that these future business opportunities "included providing material to the New York City market in which we spent a substantial amount of money and time to get New York State source approval for the Quarry stone along with the time invested in finding customers."  (*Id.*)  According to Patton, one customer "had built a custom made truck to maximize the haulage from East Haven to the NYC metro area and to return with crushed recycled material and soils from New York for the quarry reclamation."  (*Id.*)  However, Plaintiffs do not identify this customer or the nature of their business expectancy with respect to that customer; nor do they otherwise identify "a specific relationship or opportunity that Defendants caused [them] to forgo." *Kollar v. Allstate Ins. Co.*, No. 3:16-CV-01927 (VAB), 2017 WL 3222535, at *11 (D. Conn. July 28, 2017) (observing that courts in Connecticut "have dismissed tortious interference with business expectancy claims when plaintiffs fail 'to allege specific opportunities or relationships that the defendant has interfered with'") (quoting *Holt v. Safeco Ins. Co. of Am.*, No. FSTCV136017661S, 2016 WL 7196408, at *1 (Conn. Super. Ct. Nov. 8, 2016)); *see also Baer v. New England Home*

*Delivery Servs., LLC*, No. CV064021976, 2007 WL 3173701, at *3 (Conn. Super. Ct. Oct. 18, 2007) ("Tortious interference requires proof that a defendant intentionally interfered with a *known* business relationship. It is insufficient to allege and prove that the defendant knew or ought to have known that its practices had a tendency or potential, however strong, to interfere with a competitor's business generally. The defendant must intentionally and knowingly target a specific business relationship or relationships.") (quotation marks and citation omitted); *Callahan v. Callahan*, No. X08FSTCV156027843S, 2017 WL 3332743, at *2 (Conn. Super. Ct. June 27, 2017) ("Simply put, the plaintiffs cannot establish a claim for tortious interference with a business expectancy with a third party that they cannot identify.")  For the same reasons that Count Nine fails, then, the Individual Defendants are entitled to summary judgment on Count Ten.

### *Slander of Title—Count Thirteen*

"The tort of slander of title is defined as 'the uttering or publication of a false statement derogatory to the plaintiff's title, with malice, causing special damages as a result of diminished value of the plaintiff's property in the eyes of third parties. The publication must be false, and the plaintiff must have an estate or interest in the property slandered. Pecuniary damages must be shown in order to prevail on such a claim.'"  *Chamerda v. Opie*, 185 Conn. App. 627, 648–49, 197 A.3d 982 (App. Ct. 2018) (quoting *Elm Street Builders, Inc. v. Enterprise Park Condominium Ass'n, Inc*., 63 Conn. App. 657, 669–70, 778 A.2d 237 (App. Ct. 2001)).  "Actual malice requires a showing that a statement was made with knowledge that it was false or with reckless disregard for its truth.  A negligent misstatement of fact will not suffice; the evidence must demonstrate a purposeful avoidance of the truth."  *CHFA--Small Properties, Inc. v. Elazazy*, 157 Conn. App. 1, 18–19, 116 A.3d 814 (App. Ct. 2015) (quotation marks, citation and ellipses omitted).

Plaintiffs' slander of title claim is premised on Milici's allegedly unlawful recording of the farmland exemption, on May 9, 2017, on the basis of DiLungo's application. Defendants argue that the record is insufficient to establish that Milici acted with malice and that Plaintiffs have not identified any pecuniary damage with respect to the alleged slander. Plaintiffs respond that a jury could find that Milici acted with reckless disregard for the truth by failing to verify that DiLungo was authorized to act on Plaintiffs' behalf when DiLungo no longer owned the Property, and by failing to honor Plaintiffs' request to remove the farmland designation until after the inception of the instant suit. Plaintiffs also aver that they have identified pecuniary damages in the form of attorney's fees incurred in sending Milici their demand letter and in ultimately bringing this litigation. (*See* Patton Aff. ¶ 69.)

When asked whether he verified that DiLungo owned the Property at the time DiLungo filed the application for the farmland classification, Milici testified, "I took him on his word. He said he was the contact person for the LLC." (Milici Dep. Tr. at 64:19–20, Pls.' Ex. C.) DiLungo testified, however, that after Patton acquired the Property, he "had no role" in operating the quarry. (DiLungo Dep. Tr. at 34:19, Pls.' Ex. I.) DiLungo also testified that he believed he was not authorized to file the farm exemption application but he signed the application because he "believe[d] [Milici] told me that I could do this." (*Id*. at 48:9–21.) When asked why he filed the application despite his belief that he was not so authorized, DiLungo responded, "I have no idea." (*Id*. at 48:24; *see also id.* at 51:20–23.)

In light of this conflicting evidence, the Court agrees with Plaintiffs that the question of whether or not Milici acted with reckless disregard for the truth in processing the farmland exemption application must be resolved by the jury. *See CHFA*, 157 Conn. App. at 20–21 ("The determination of whether a defendant possesses knowledge of the falsity of a defamatory statement

and believes, honestly and in good faith, in the truth of his statements and the determination of whether he has grounds for such belief are factual questions to be resolved by the trier of fact").[34] And because Plaintiffs have identified pecuniary losses as a result of the alleged slander of the Property, summary judgment is improper on this basis as well.  Defendants' motion with respect to Count Thirteen is denied.

**Conclusion**

For the foregoing reasons, the Town of East Haven's motion for summary judgment is denied with respect to Plaintiff's Section 1983 claims pursuant to the Fourteenth Amendment Takings Clause and Substantive Due Process Clause, denied as to Plaintiff's claims pursuant to Article First, Section 11 of the Connecticut Constitution and for municipal estoppel, and granted in all other respects.  The Individual Defendants' motion for summary judgment is denied with respect to Plaintiffs' Section 1983 claims pursuant to the Fourteenth Amendment Takings Clause and Substantive Due Process Clause against Maturo and Soto, denied as to Plaintiffs' slander of title claim against Milici, and granted in all other respects.  The Clerk of Court is directed to terminate Defendant Nimons from this action.

**SO ORDERED** at Bridgeport, Connecticut, this 27th day of September 2021.

/s/ Kari A. Dooley
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE

---

[34]To the extent Milici asserts immunity pursuant to Conn. Gen. Stat § 4-165, that argument is rejected as this statute has no application here insofar as it affords immunity to state employees.  *See* Conn. Gen. Stat. § 4-141(5) (defining "State officers and employees" as including "every person elected or appointed to or employed in any office, position or post in the state government"); *Sansone v. Bechtel*, 180 Conn. 96, 100, 429 A.2d 820 (1980) (concluding that "[a] school teacher does not come within this definition," as "[a]lthough a town board of education is an agent of the state when carrying out the interests of the state, its members are not state but town officers").  The Court declines to consider whether Milici is immune from liability pursuant to Conn. Gen. Stat. § 52-557n(a)(2)(B), as Defendants have not adequately briefed the applicability of this provision to municipal employees, or whether, if applicable, Milici's acts in recording the farmland designation were discretionary within the meaning of the statute.